THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RUSSEL SMREKAR, Defendant-Appellant.

Fourth District   No. 14463

Opinion filed January 30, 1979.—Rehearing denied March 5, 1979.

Richard J. Wilson and Charles M. Schiedel, both of State Appellate Defender's Office, of Springfield, for appellant.

Roger W. Thompson, State's Attorney, of Lincoln (Robert C. Perry, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendant, Russel Smrekar, appeals judgments, entered after a jury trial, convicting him of having murdered Alvin J. and Robin Fry, husband and wife, at Lincoln on October 9, 1976, and sentencing him to consecutive sentences of 100 to 300 years' imprisonment. The charges were filed in the circuit court of Logan County but the case was transferred for trial to Moultrie County pursuant to defendant's motion for a change of venue.

In his brief filed by counsel, defendant contends that (1) his rights to due process and counsel were violated by the identification testimony of a witness, Ann Mardis, who had made a prior identification of him at a time when he was not represented by counsel and she had recently undergone hypnosis; (2) his due process rights were further violated because the State failed to disclose to him before trial correspondence between the State's Attorney and a prosecution witness; (3) the trial court further denied his right to counsel by (a) soliciting an inmate, jailed with him, to obtain incriminating statements from him and (b) refusing him a continuance on the day of trial so that he could obtain private counsel; and (4) the court erred in permitting the State to call a court's witness and then impeach that witness by use of a prior inconsistent statement. We have granted defendant leave to file a pro se brief in which he cites the court's permitting the State to produce evidence of his commission of a separate crime as additional error.

We begin with a brief outline of the evidence.

Ann Mardis testified that she was a sister of Alvin Fry and lived next door to him. At about 1 a.m., on October 9, 1976, she had a brief conversation with the Frys as they returned to their home and then went into her house. In a few minutes she heard a "roaring noise" from the direction of her brother's residence. She looked out the window again and saw a man standing between the two houses. She observed him for 30 or 40 seconds during which time he walked slowly away from the Fry house, then turned around and went inside. She called her brother's number on the phone and upon getting no answer became very concerned, awoke her husband and, with her husband, went to the brother's house. There they found the shotgunned bodies of her brother and sister-in-law. At trial, Ms. Mardis identified defendant as the person seen outside the Fry's house.

At about 3:30 a.m. on that date, defendant, who lived in Joliet, was arrested on U.S. Route 66 near Odell, Illinois, by an officer who testified

that defendant was driving at a speed of 96 miles per hour in a northeasterly direction.

Defendant had previously been charged with misdemeanor theft in Logan County and his case was set for trial on October 19, 1976. Alvin Fry was a prosecution witness against him. Ruth Martin was also a prosecution witness in that case. In June of 1976, she disappeared and had not been found. Evidence was introduced that her blood-stained car had been found.

Defendant was held in the Macon County jail pending trial on the murder charge. While Deputy Sheriff McCammon was admitting defendant to the jail he remarked to the defendant that the charges were serious. According to McCammon's testimony, defendant then stated that he had committed the offense but the State would have to prove it. Defendant testified that he had responded that the charges were serious but would never be proved because he "had not done it."

Two men who were jailmates of defendant's in the Macon County jail testified to confessions and admissions defendant made to them. On behalf of those witnesses, the State has presented a motion requesting that, for the protection of these witnesses, their names not appear in the opinion. We have allowed that motion and will refer to them as Witnesses I and II. Witness I stated that defendant said he killed the Frys with a shotgun in order to prevent them from testifying against him and also killed Ruth Martin for the same reason. Witness I also stated that defendant indicated that he had an alibi set up with his girlfriend. He also stated that the police made him no promises in exchange for his testimony but that the Logan prosecutor told him that his cooperation would be made known. Witness II testified to similar admissions and confessions by defendant as to killing the Frys and Ruth Martin and also testified that defendant offered him $5,000 to kill Ann Mardis. His testimony concerns points of error raised by defendant and will be discussed in more detail in connection with those issues.

Defendant's defense was alibi and was based upon his testimony and that of his friends and relatives. He denied making the admissions and confessions attributed to him and denied that he was in Lincoln at the times in question. His testimony was that he was in his home town of Joliet early that evening, had supper there at 5 p.m., drove around town for about 4½ hours, visited a cousin for 2½ hours, then rode around town for awhile and thereafter, in order to go to Kankakee to see about a campsite, drove west on Interstate 80 to the intersection of Interstate 55 which he then took in a southwesterly direction. He stated that he thought there was a Kankakee turnoff somewhere north of Odell and when he got to Odell he decided that he had missed the turnoff, made a U turn, headed

north and was arrested for speeding. Defendant maintained that after being released by the arresting officer, he went on to Kankakee, looked at a campsite and then drove home.

To support his alibi testimony, defendant also called his mother, father, cousin, and girlfriend as witnesses. Although they corroborated some of his testimony, they were inconsistent at times and were also impeached by their bias in his favor and prior inconsistent statements. The strength of defendant's alibi was also weakened by (1) the testimony of the officer who arrested him at Odell, disputing various aspects of the conversation between them at the time the speeding arrest was made and (2) testimony that the route selected by defendant to go from Joliet to Kankakee was very circuitous. The jury could have concluded that the alibi evidence was very weak.

Two unusual evidentiary problems arise from Ann Mardis' testimony, given early in her direct examination, that defendant was the person she saw in the Fry yard after she heard the loud noise. She further testified on direct examination that on October 10, the day after the day of the early morning murder, she went to the Lincoln police station and upon being shown about a dozen photographs (later testimony indicates there were six) identified two as resembling the person in question. One of these photos was of the defendant. She next testified that on October 18, she accompanied police officers to the Logan County Court House. After staying a few minutes on the first floor, they went to the third floor. Some 40 people were present in the rotunda of that floor. When defendant walked by, Ms. Mardis pointed him out as the person she had seen in the yard. Defendant was present as a defendant in a misdemeanor theft case but no evidence introduced presented any evidence that would have suggested to her that he was there for that reason. He had counsel in that case but had not yet been charged in the instant case.

On cross-examination, Ms. Mardis stated that on three occasions between October 10 and 18 of that month in 1976, she had consulted with a physician about her memory of the events which took place immediately after the murders. On the last two visits, the doctor had hypnotized her, with the last hypnosis taking place three or four days before she made her October 18 identification of defendant at the Logan County Court House. She admitted that prior to being hypnotized, she had described her chances of being able to identify the person she saw in the Fry yard as being "50-50."

■■ On appeal, defendant, for the first time, raises the issues that (1) the prior hypnosis suggested his identification to Ms. Mardis and deprived him of the right to cross-examine her and (2) the procedures for identification used at the court house constituted the holding of a lineup without his having the benefit of counsel. Although no objection was

made to this procedure at trial nor in defendant's post-trial motion, we choose to address these issues and rule that no waiver occurred.

In *People v. Harper* (1969), 111 Ill. App. 2d 204, 250 N.E.2d 5, a complainant in a rape case had been unable to identify her assailant prior to undergoing hypnosis and receiving injections of a serum purporting to cause persons to speak the truth while under its influence. The trial court entered an order suppressing "evidence of any facts or supposed facts which" the victim "may have learned solely as a result of hypnosis" or the use of the drug. This court affirmed, discussing mostly the indications in various cases that the results of examinations of persons who had taken various so-called "truth drugs" were not considered reliable enough to be admitted into evidence. The opinion referred to the aspects of the case concerning hypnosis only to state, "We see no reason to equate examination under hypnosis and examination while under the influence of a drug having the effect of a so-called 'truth serum' except to note that the scientific reliability of neither is sufficient to justify the test results of either in the serious business of criminal prosecution." 111 Ill. App. 2d 204, 209, 250 N.E.2d 5, 7.

As stated in *Harper*, when the test results of hypnosis of a witness have been offered in evidence through the testimony of the examining expert as to what the witness told the expert while under hypnosis, the courts have, apparently uniformly, ruled this testimony to be inadmissible. *Greenfield v. Commonwealth* (1974), 214 Va. 710, 204 S.E.2d 414; *Rodriguez v. State* (Fla. App. 1976), 327 So.2d 903; *Jones v. State* (Okla. Crim. App. 1975), 542 P.2d 1316; *State v. Pierce* (1974), 263 S.C. 23, 207 S.E.2d 414; and *State v. Pusch* (1950), 77 N.D. 860, 46 N.W.2d 508.

Here, the State did not offer in evidence any testimony of what, if anything, the witness told the hypnotist about the event. The issue was not whether the results of the test under hypnosis were admissible in evidence but rather whether the hypnosis tainted the identification made by the witness at the court house and, therefore, her subsequent in-court identification testimony so as to make that testimony inadmissible. No case has been called to our attention so holding, and in *Harding v. State* (1968), 5 Md. App. 230, 246 A.2d 302; *State v. Jorgensen* (1971), 8 Ore. App. 1, 492 P.2d 312; *United States v. Narciso* (E. D. Mich. 1977), 446 F. Supp. 252; *State v. McQueen* (1978), ___ N.C. ___, 249 S.E.2d 464, and such civil cases as *Connolly v. Farmer* (5th Cir. 1973), 484 F.2d 456, and *Wyller v. Fairchild Hiller Corp.* (9th Cir. 1974), 503 F.2d 506, the testimony of the previously hypnotized witness has been ruled to be admissible. In each of those cases, as here, the witness testified to an improved recollection after the hypnosis.

Medical authorities indicate that hypnosis has become established as

a valuable tool in the hands of the skilled practitioner and can be used to restore the memory of experiences which have been repressed due to their unpleasant or painful nature. Noyes & Klob, Modern Clinical Psychiatry 603 (1973); American Handbook of Psychiatry, ch. 12, *Hypnotherapy*, by Lewis R. Wolberg (Artieti ed. 1974) (hereinafter cited as Wolberg); Comprehensive Textbook of Psychiatry §34.34, *Hypnosis: An Adjunct to Psychotherapy*, by Herbert Spiegel (Freedman & Caplan eds. 1967).

However, the use of hypnosis is not without problems. "Asking a patient to recall only real events, or to verify aspects of the material as true or false, reduces but does not remove the element of fantasy." (Wolberg.) The hypnotized subject is also subject to suggestion by the hypnotist. Despite these infirmities, the courts in *Harding, Jorgensen* and *Narciso* ruled the testimony of the formerly hypnotized subject to be admissible and the effect the hypnotism might have had on the witness to be a factor bearing upon the weight to be given to the testimony.

The ruling in those cases is in line with the general rule that when a witness is capable of giving testimony having some probative value, the witness is permitted to testify with evidence of impairment of the ability of the witness to accurately recall evidence or that suggestive material has been used to refresh the witness's recollection going only to the weight to be given to the testimony of the witness (McCormick, Evidence §§9, 45, 63, at 17, 93, 141 (2d ed. 1972)). The notable exception to the foregoing is the requirement that testimony in a criminal case of the identification of the accused as the culprit must be excluded if that identification has been tainted by a prior unduly suggestive procedure and has no independent origin. See *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, and its progeny.

The question of the propriety of hypnotizing occurrence witnesses prior to trial in order to sharpen their recollection was presented in an unusual way in *United States v. Adams* (9th Cir. 1978), 581 F.2d 193, cited by the State as additional authority. Adams was convicted in the Federal district court of the robbery and murder of a postal worker. One Morin, allegedly an occurrence witness, was hypnotized before trial by postal inspectors and a statement was taken from him. Whether the statement was taken while the witness was under hypnosis or later is not entirely clear. However, the opinion describes it as a "post hypnosis" statement so it was apparently taken after rather than during the hypnosis. Prior to trial, Adams moved to have Morin's "testimony limited to his prehypnosis statements." How that could have been done is not clear. The district court denied the motion. At trial, Adams rather than the prosecution called the witness and the prosecution was then permitted to impeach him with the "post hypnosis" statement given to the postal inspectors.

The circuit court of appeals noted its prior decisions in *Kline v. Ford Motor Co.* (9th Cir. 1975), 523 F.2d 1067, and *Wyller* and those of other courts in *Jorgensen* and *Harding* holding that prior hypnosis affects the credibility of the witness but not the admissibility of the testimony, concluded the reasoning of those cases to be sound, and affirmed. However, the court also expressed concern over the possibility of suggestion arising from the hypnosis and then stated:

"Although we do not approve of the hypnosis methods used here, Adams did not object to the adequacy of the foundation laid for the receipt of the testimony. Rather, he attempted to exclude all in-court testimony of Morin on the grounds that no testimony from witnesses who had been hypnotized could be reliable, and that the use of testimony of a witness who has been hypnotized would deny the defendant his Sixth Amendment right to confrontation and his right to call witnesses on his own behalf. The predicate for both constitutional arguments is that the in-court testimony of a witness who had earlier been subject to hypnosis is unreliable as a matter of law rendering the witness legally incompetent to testify. We rejected that premise in *Kline v. Ford Motor Company, Inc., supra,* and we see no reason for a different result in the context of a criminal case." 581 F.2d 193, 199.

A footnote indicated that the reasons for the court's disapproval of the methods used were: (1) the hypnotists were "uncertified" and (2) no records were kept of the persons present and the questions asked and answers given during the hypnosis session.

The significance of *Adams* is not entirely clear. The defendant there chose to call a witness who had been previously hypnotized, and then objected to the prosecution impeaching the witness by an inconsistent statement made after the hypnosis. That situation differs somewhat from that here where the prosecution called a witness whose recollection had been improved by prior hypnosis.

The doctor who had hypnotized Ms. Mardis testified that he was a general practitioner but had been using hypnosis regularly for 10 to 15 years. His expertise was thus greater than that of postal inspectors, and he was certified in the sense that he was licensed to practice medicine generally, but no showing was made that he had been certified by any board as a specialist in hypnosis. Apparently only he and Ms. Mardis were present during the sessions. No records were kept of the questions asked and answers given during the sessions, but he did testify that he did nothing to suggest a particular identification to her. He did direct her to form a picture in her mind of the scene she saw on the early morning in question when she looked out and noticed a man in the Fry yard. Defendant maintains that the doctor's direction to her to form a picture

suggested to her that she focus her mind on the picture of defendant which she had earlier identified. We do not find the testimony to so indicate. Although greater safeguards would be maintained by following the procedure suggested in the *Adams* footnote, we find the doctor here to have been shown to be competent and his procedure to have not been unduly suggestive.

The considerable corroboration in the other direct and circumstantial evidence and the weakness of defendant's alibi also indicate that Ms. Mardis was not fantasizing when, after hypnosis, her mind focused upon defendant, a man she had never seen before the murder, as the person in the yard.

■■ Defendant bases his claim of error partly upon a deprivation of his right to cross-examine the previously hypnotized witness. However, the ability to cross-examine the witnesses is one element that distinguishes the use of testimony of the previously hypnotized witness from the impermissible procedure of introducing testimony of the hypnotist as to the statements made to him by the patient while under hypnosis. While the hypnosis could affect the mind of the witness in such a subconscious way that the cross-examination could not reach, all witnesses are, to some extent, subject to subconscious stimuli similarly obscure.

We rule that the testimony of Ann Mardis identifying the defendant as the person she saw at the scene of the crime is not rendered inadmissible by her hypnosis prior to making a positive identification of him and prior to testimony at trial where (1) the hypnotist was shown to be competent, (2) the evidence indicated that suggestion was not used in the hypnosis, (3) the identification was corroborated by other substantial evidence unknown to the witness at the time she made positive identification of the defendant, and (4) the evidence showed that at the time of the occurrence, the witness had ample opportunity to view him. We consider this testimony to have been an aid to the trier of fact in arriving at the truth and to have been properly admitted.

■■ Defendant concedes that when Ms. Mardis identified him at the court house on October 18, 1976, he had no right of counsel arising out of the murder case because no proceedings had then been initiated against him (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct 1877). In *Jackson v. Jago* (6th Cir. 1977), 556 F.2d 807, a similar court house identification made by a witness of an accused not yet charged but represented by counsel defending another case was upheld. (See also *Boyd v. Henderson* (2d Cir. 1977), 555 F.2d 56, *cert. denied* (1977), 434 U.S. 927, 98 S. Ct. 410, 54 L. Ed. 2d 286.) The prosecution owed no duty here to defendant's counsel in the theft case to inform him that an identification of the defendant would be attempted.

Prior to trial, defendant demanded by discovery motion all relevant

written statements of the State's intended witnesses. The State furnished the defendant with various letters written to the Logan County State's Attorney by Witness II but did not furnish three such letters written in the three-week period immediately preceding trial. Defendant argues that these letters were statements by the witness bearing upon his credibility and would have prompted the defendant to further investigate the witness. Witness II testified at trial to the details of a confession by the defendant. The witness also testified he did not himself know of the accuracy of these details, implying that if the details were corroborated by other evidence that would indicate the veracity of his testimony because he could not fabricate what he did not know about. Some of the letters indicated that Witness II had access to publications of the news media and could have gotten this information from that source. Another letter indicated that he had been trying to evangelize defendant and stated that if the defendant had accepted Christ, "You would not have me as a witness." Portions of the letter evidenced a religious fanaticism on the part of Witness II and were also probative of a bias he might have against defendant for rejecting his evangelism. Defendant maintains that the investigation which would have resulted from discovery of the letters would have revealed, as post-trial evidence indicated, that Witness II was an epileptic taking medication causing confusion, had a bullet lodged in his brain and had taken several psychiatric examinations.

The letters thus contained some information favorable to the defendant. In *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392, the United States Supreme Court has recently discussed the rules concerning the consequences of the withholding by the State of information favorable to the defense, amplifying its decisions in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and *Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763. *Agurs* ruled that where the withheld information had not been specifically requested by the defense, the award of a new trial was constitutionally mandated only if the withheld evidence, when added to the other evidence in the case, would have been sufficient to have created a reasonable doubt of the defendant's guilt in the mind of the court.

■■ The majority here is not in agreement as to the significance of *Agurs* upon the standard to be applied in ruling upon a request for a new trial when the withheld information has been specifically requested. The writer is of the opinion that the combined effect of *Agurs, Giglio* and *Brady* is that under those circumstances, as when information concerning perjury by prosecution witnesses is withheld, a new trial must be awarded "if there is any reasonable likelihood" that the withheld information "could have affected" the verdict. 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349-50, 93 S. Ct. 2392, 2397.

Here, the defendant had specifically requested statements of the witnesses the State intended to call. Witness II was such a witness. In *People v. Jones* (1977), 66 Ill. 2d 152, 361 N.E.2d 1104, the court ruled that a request for statements of witnesses was not a specific request for a copy of the grand jury testimony of that witness. However, we need not decide whether the request for the statements of prosecution witnesses was a specific request for the letters in question. The most that the withheld information could have accomplished was to completely nullify the probative value of the testimony of Witness II. Even without that testimony the totality of (1) the testimony of the confessions and admissions of the defendant to Witness I and Deputy McCammon, (2) the circumstances of defendant's speeding arrest at Odell at a time when he would likely have been fleeing from the crime, (3) his motive to kill, and (4) the mysterious disappearance of Ruth Martin accompanied by evidence of his confession of killing her, together with whatever weight the jury might have given to the identification testimony of Ann Mardis, and all in the face of defendant's unlikely and highly impeached alibi evidence, would present a picture of overwhelming proof of guilt.

■■ ■ The majority is in agreement that the withheld evidence would not have created a reasonable doubt of the defendant's guilt. The writer also finds that there is "no reasonable likelihood" that the withheld evidence would have "affected the verdict." We thus conclude that reversible error did not occur as the result of the failure of the State to give discovery of the letters written by Witness II.

A question of possible deprivation of defendant's right to counsel also arose from the obtaining of the admissions and confessions from defendant by Witness II while they were jailmates. On October 22, 1976, four days after defendant's arrest, Witness II wrote to Roger Thompson, the Logan County State's Attorney who had previously, as public defender, represented him and told Thompson that two Logan County prisoners in the Macon County jail cell block with him acted as if they thought their crimes were "a big joke." Thompson, apparently assuming that defendant was one of these prisoners, answered the witness by letter delivered by Logan County Deputy Winter, stating that he, Thompson, "would appreciate your sharing information on" defendant and the other prisoner with Winter. Subsequently law enforcement officers visited Witness II and asked him questions as to what the defendant had told him and the witness, by his own admission, kept "digging" to get further information. Thompson and the other law enforcement people who had contact with Witness II all testified that they had not asked Witness II to obtain specific information from the defendant.

In *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199, after an accused had been charged with a narcotic offense,

Federal narcotics agents had arranged with a co-defendant of the accused to place electronic receiving devices in the co-defendant's automobile and then to listen to and record conversations between the accused and the co-defendant which included admission of guilt by the accused. The United States Supreme Court ruled the admission of evidence of these statements at the subsequent trial on the narcotics offenses to deprive the accused of his right to effective assistance of counsel. The essence of the holding was that "federal agents had deliberately elicited" this information from the accused at a time after the accused had been charged and had a right to counsel. 377 U.S. 201, 206, 12 L. Ed. 2d 246, 250, 84 S. Ct. 1199.

In *People v. Milani* (1968), 39 Ill. 2d 22, 233 N.E.2d 398, as here, a prison mate of the defendant testified to confessions and admissions made by the defendant to the prison mate at a time after the defendant had been charged and was represented by counsel. The supreme court affirmed, ruling that because the only admissions or confessions admitted into evidence were made before the informer had any discussion with law enforcement officials in regard to obtaining information, no breach of the *Massiah* rule occurred regardless of the subsequent relationship between the informer and the officials. In an appeal arising from a subsequent denial of a writ of habeas corpus by a Federal district court, the reviewing court affirmed, agreeing with the supreme court's analysis and also stating that even if the later arrangement between the informer and officials had existed at the time of the admissions and confessions, their introduction into evidence would not have been error because the officials were mere recipients of information given them by the informer. *United States ex rel. Milani v. Pate* (7th Cir. 1970), 425 F.2d 6.

The facts of the case on appeal are much closer to *Milani* than to *Massiah*. The ultimate relationship between law enforcement officers and the informer was not shown to differ except for the letter from the prosecutor asking for the "cooperation" of Witness II. However, we need not concern ourselves with that letter because the only admissions or confessions of the defendant testified to by Witness II during his examination by the State arose from a conversation on October 24, 1976, two days before the letter. The evidence did not show that the State had made any attempt to obtain evidence from Witness II before that time. The introduction of the evidence in question did not violate any right of the defendant and did not create any error.

Defendant bases his claim that the trial court erred in not granting him a continuance on the day of trial so that he might obtain counsel of his own choosing upon *People v. Green* (1969), 42 Ill. 2d 555, 248 N.E.2d 116, and *People v. Clayborne* (1977), 47 Ill. App. 3d 202, 361 N.E.2d 1141. Reversible error was ruled to have occurred in both cases when the trial

court denied continuances to obtain private counsel requested on date of hearing, but neither case involved a jury trial and both involved special circumstances. In *Green,* the defendant was charged with a misdemeanor and a church agreed to obtain a lawyer for him, but the lawyer did not appear on the date of trial and the defendant was required to go to trial that day with a court-appointed lawyer who had no time to prepare. In *Clayborne,* the motion was made on the day of a hearing on a motion to revoke probation. The defendant, who was represented by the public defender, wished to be represented by a lawyer who had been hired to represent him on the criminal charge, which was also the basis for the motion to revoke. In both cases, the likelihood of a private attorney subsequently appearing for the defendant was great and no jury schedule would have been upset by granting a continuance.

■■ Here, at the time the court originally appointed counsel at defendant's request, defendant had stated that he might later want to hire counsel of his own. He testified that on February 19, 1977, three days before trial and after the court had denied his motion to suppress, he conferred with his family and made arrangements to hire counsel of his own. He stated that he was not permitted to phone his court-appointed counsel to tell him of that decision. However, defendant had waited too long. On December 29, 1976, the court set the case for jury trial on February 22, 1977. No showing was made that any lawyer was in fact willing and available to step in and, unlike in *Green* and *Clayborne,* no indication had been given that a lawyer would do so, nor was there any readily apparent way for the court to check to see if any lawyer would do so. No deprivation of the right to counsel or other reversible error occurred in the court's denial of a continuance.

■■ The parties agreed that a stipulation would be presented to the jury as part of the State's case in rebuttal. The stipulation indicated, that if called as a witness, the husband of the cousin of defendant whom he claimed to have visited on the evening of October 8, 1976, would testify that he, the husband, went to bed at 9 p.m. that night and did not see the defendant that evening. The parties further stipulated that if further called as part of the State's rebuttal, a detective would testify that the cousin's husband had given him a statement inconsistent with his stipulated testimony. No explanation for the stipulation appears in the record. The testimony of the husband, although impeached, was somewhat helpful to the defense because it corroborated the testimony of the defendant and the cousin. Perhaps it was admitted in rebuttal because the defense had forgotten to use it as part of its case. In any event, the introduction of the evidence was not plain error and, having stipulated to the admission, defendant cannot complain on appeal. *People v. Polk* (1960), 19 Ill. 2d 310, 167 N.E.2d 185.

■■ ■ Defendant's pro se supplemental brief contends that admission of the disappearance of Ruth Martin and his confessions of having killed her were improper evidence of his having committed a separate offense. The commission by the defendant of other offenses is inadmissible for the purpose of showing a propensity to commit crime but may be admitted for various limited purposes including a showing of *modus operandi*. (*People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288; *People v. Brown* (1962), 26 Ill. 2d 308, 186 N.E.2d 321.) Here, the evidence showed that defendant had a *modus operandi* of murdering witnesses who would otherwise be available to testify against him in the theft case. The court gave an instruction properly limiting the use of the evidence. The court had made a pretrial ruling that allowed evidence of the disappearance of Ruth Martin and of defendant's statements that he killed her, but would have prohibited testimony of blood found in her car after her disappearance. However, the court stated that the ruling might be changed at trial. No error occurred when the court subsequently admitted the latter evidence. The testimony concerning Ruth Martin was properly admitted.

After searching this long and complicated record, we find no reason why these convictions should not stand.

■■ After the case was submitted, defendant was given leave to file supplemental authority, citing as error that the consecutive sentences were improper because their imposition violated the provision of section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—4(a)) that such sentences shall not be imposed "for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective * * *." However, the evidence here indicated that Jay Fry was a witness against defendant and Robin Fry was not. The trial court could have concluded that defendant had a different objective in murdering Robin Fry than he had in murdering Jay Fry. No error occurred in sentencing.

The convictions and sentences are affirmed.

Affirmed.

TRAPP, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:

Hard cases make bad law. This case is a prime example of the truthfulness of that adage. My colleagues find no difficulty admitting testimony that has been made probative, and, in fact, may well have been "retrieved" through a hypnosis process about which we know very little and for which there is no foundation found in the record. Although the

objections that should have been made were not made, the majority opinion proceeds, not upon the basis of waiver, but upon the basis of merit. This is done because of the clear dilemma presented by the record. When counsel permits testimony to come in based upon "improved" memory due to hypnosis and makes no objection, even a kneejerk objection, serious questions as to competency of counsel could be raised. This is avoided, however, when the court proceeds to pass upon the merits of the issue and concludes that the testimony thus elicited is admissible and the procedures involved relate to the weight and not the admissibility of the testimony. Thus, for the first time in Illinois, testimony retrieved or enhanced by hypnosis is ruled admissible. There is no foundation in the record, there is no showing as to the scientific basis for hypnosis, there is no recording of the hypnosis sessions, there is nothing to establish that the testimony thus retrieved is substantially probative and an aid in the truth-seeking process.

In an article on hypnosis, Monrose, *Justice With Glazed Eyes*, Juris Doctor 54, 56 (Oct./Nov. 1978), it is written:

"Few people do know anything tangible about hypnosis. Despite modern hypnosis's 200-year-old history, most information about it is still theoretical and shrouded in the obscurity of myth, misconception, and mystery. Even the term 'hypnosis' is a misnomer. Coined in the 1840s by James Braid, a Scottish surgeon, the word stems from the Greek *hypnos*, meaning 'to sleep,' and has thus perpetrated the canard that a person in an hypnotic trance is unconscious. The truth seems to be that while a person under hypnosis may appear to be asleep and to respond to the hypnotist with complete submission, he actually suffers no loss of will."

An article in the Wall Street Journal (June 27, 1978), Ronald Alsop, *Clue That Is Buried In the Subconscious May Crack the Case*, contained the following observation attributable to critics of hypnosis:

"Critics of forensic hypnosis charge that it smacks of totalitarian mind-manipulation, and they warn that amateur hypnotists may conjure up 'memories' that are more fantasy than fact. 'Well-meaning law-enforcement officers, under pressure to solve a case, might suggest memories that would help secure a conviction,' says Robert Reiff, a psychologist and teacher at the University of Texas. He has sent Mailgrams to Attorney General Griffin Bell and the Law Enforcement Assistance Administration expressing his qualms.

Martin T. Orne, professor of psychiatry at the University of Pennsylvania, warns that the danger is very real. 'The nature of hypnosis is such that you respond to suggestion,' he says. 'The same way I can help you refresh your memory, I also can help you construct memory where there isn't any.'

Other critics say hypnosis is too 'new-fangled and unreliable' to be used in criminal proceedings where a defendant's life may be at stake. Ephraim Margolin, a San Francisco attorney, tells of a client, an 18-year-old girl who confessed to murder under hypnosis, but later was cleared of the crime.

'She just gave the police what she thought they wanted,' says Mr. Margolin. He believes hypnosis is too technical to be trusted to policemen."

Criminal felony prosecution is a serious business and we have enough difficulty ascertaining truth. While I am not persuaded that the truth-seeking process is necessarily helped by the use of hypnosis, I certainly am persuaded that it is incumbent upon one who tenders testimony retrieved, enhanced, or obtained by hypnosis to establish what the procedure is, what its limitations are, and what such tinkering amounts to. Absent such foundation, the evidence is inadmissible.

If one is to accept the reasoning of the majority, then voice print, truth serum, polygraph, or any other real or imagined way of judging truth would be rendered admissible with only the weight to be given to such testimony left for resolution by the trier of fact. Thus, I view this hard case to make bad law.

Finally, there was error in the ruling by the trial court with reference to the discovery of the letters identified in the majority opinion as having been written by Witness II. The majority concedes that the letters were discoverable but concludes that the failure to comply with discovery was harmless in that there was no reasonable likelihood that the letters could have affected the verdict. In making that judgment they consider the identification testimony that should have been excluded. Query: Could we say that the verdict could not have been affected by the failure to disclose the Witness II letters as required by *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, if we exclude from the record the identification testimony? I submit the answer is that we cannot.

For the stated reasons, I disagree with the conclusion reached by the majority. This defendant is entitled to a new trial.