THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAVID GRAY, Defendant-Appellant.

Fifth District   No. 78-485

Opinion filed December 21, 1979.

214

John H. Reid and Randy E. Blue, both of State Appellate Defender's Office, of Mt. Vernon, and Martin Rothfelder, law student, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Raymond F. Buckley, Jr., and Gary L. Cobe, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

Following a jury trial in the Circuit Court of Madison County, defendant, David Gray, was convicted of rape, armed robbery and attempt (murder). From his conviction and sentence defendant appeals.

At trial, the complainant testified that she was home alone at 5:30 p.m. on March 29, 1978, when a black man came by to see a motorcycle which she had for sale. After examining the bike in the garage, the man asked to use the telephone. In the living room, he grabbed complainant and dragged her to the kitchen where he picked up a butcher knife from behind the kitchen sink. He then forced her into the bedroom and raped her. She was allowed to dress but was threatened with the knife and forced to give him money and jewelry. He then pushed her onto the floor and stabbed her 33 times. After he left, she observed that the telephone had been pulled from the wall.

The complainant testified that her assailant wore a shirt with a brown and green floral pattern on a white background, dark pants with thin white stripes, shiny plastic high-heeled wine-colored shoes and a gold earring in his left ear. Complainant further testified that this man was the same person who had come to her home at 9:30 a.m. on March 23, 1978, to ask about a car on her neighbor's driveway. She informed him that the car belonged to her neighbor, Lyman Wallendorf, but added that she had a motorcycle for sale. The man then went next door where he discussed with Mr. Wallendorf the possibility of purchasing the automobile.

Both Lyman Wallendorf and complainant were asked to identify, if possible, the man from an array of photographs and lineup. Mr. Wallendorf picked defendant out of each indicating that he looked familiar, but was unable to make a positive identification. Complainant viewed the photograph array from her hospital bed and after narrowing the field of seven pictures down to two, she indicated that defendant was the man. She likewise identified defendant as her assailant at the lineup and at trial.

The defense presented evidence that defendant was not at complainant's residence at the times she had specified. On March 23, 1978, defendant was employed by the Salvation Army, which is 1.7 miles from complainant's home. His time card indicated that on this date defendant had worked from 8:33 a.m. until 1 p.m. Mildred Glassey, an employee of the Salvation Army who kept track of defendant's time, testified that when she arrived at 9 a.m. that morning she saw defendant buffing the hall outside her office. She added that she had occasion to see defendant during the morning hours because her office looked out onto the hall where defendant worked and because she periodically asked him to carry in donated items. Neither Ms. Glassey or defendant's supervisor, Captain Ronald Gorton, discovered defendant to be missing or away from his work without permission on the day in question or at any other time; however, Ms. Glassey did not testify that she saw him at 9:30, the alleged time defendant first visited complainant's home.

Defendant's parents; defendant's girlfriend, Sarah Gilbert; and Sarah Gilbert's mother testified that at approximately 5:30 p.m. on March 29, defendant, along with Sarah, her mother and sister, drove to defendant's parents' home in which defendant also lived. Defendant and Sarah went inside the house while the mother and sister proceeded to Delores Moore's home to attend a birthday party for two of Ms. Moore's grown children. One of these children, Sheila Moore, whose birthday was on April 3, testified that though she could not recall the date of the party she was "pretty sure" that it occurred on a date later than March 29, because the parties were generally held after the birthdays.

Defendant's parents and Sarah Gilbert testified that defendant and Sarah were together at the Gray residence until 10 p.m. At that time, Sarah called a taxi and went home. A taxi log book entered into evidence reflected one ride from defendant's home to Paul Street, the street on which the Gilbert's lived, at 10:15 p.m. on March 29.

Scientific evidence was also introduced at trial. Certain tests involving a comparison of sperm and blood stains found in complainant's home with defendant's blood were termed inconclusive as was a comparison test of foreign hairs found on complainant and hair from defendant. The only clear fingerprints found in the residence were two prints discovered on the

motorcycle touched by defendant. They did not match defendant's fingerprints.

James Legate, a paid Illinois Department of Investigation informant, testified that he was currently imprisoned in Madison County jail for a burglary conviction and that he had shared a cell with defendant. According to Legate, defendant stated to him that defendant, along with a friend, had been to complainant's home on two occasions. The first time there, they had intended to break into the home and rob her but decided not to do it when they saw the next-door neighbor. The second time, defendant's companion raped the complainant, stabbed her and ransacked the house. Defendant watched the rape and stabbing and in addition ransacked the house and took some checks. Legate indicated that during the commission of the crimes, defendant wore gloves and wine colored shoes.

Assistant State's Attorney Don Weber first contacted Legate regarding defendant's case during the jury selection at defendant's first trial, which had resulted in a hung jury. When he asked Legate whether defendant had said anything about the case, Legate replied in the affirmative. Legate then discussed the case with Weber indicating that he would say anything "to keep out of the penitentiary." According to Legate, Weber told him he would "see to it" that he did not have to go to prison. Thereafter, Weber filed a motion to reduce Legate's term of imprisonment. Legate indicated that based on a conversation he had with Weber he expected to be released from prison within one or two weeks of defendant's trial.

■■■ Defendant contends that his conviction must be reversed because he was not proved guilty beyond a reasonable doubt. The focal point of defendant's argument is the strength of defendant's alibi as compared to the strength of the identification testimony. It is well within the province of the jury to judge the credibility of the witnesses, to weigh the evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the testimony. (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858; *People v. Hamilton* (1975), 27 Ill. App. 3d 249, 327 N.E.2d 35.) This court will not reverse the determination of a jury on matters of credibility unless the evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Hamilton.*) It has long been held that a positive identification of the accused by a single witness who had ample opportunity for observation is sufficient to support a conviction. (*People v. Vriner; People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) This is true even though there may have been minor discrepancies in the description of the accused's attire (*People v. Smith* (1978), 59 Ill. App. 3d 480, 375 N.E.2d 941) or testimony raising an alibi defense. (*People v. Hamilton.*) Furthermore, the jury is under no obligation to believe the

alibi testimony over the positive identification of the accused even though given by a larger number of witnesses. (*People v. Hamilton.*)

■ In the present case, complainant had the opportunity to observe her assailant on two separate occasions under adequate lighting. Her positive identification of defendant was corroborated in part by the testimony of her neighbor, Wallendorf, and the informant, Legate. The jury, having the opportunity to view the demeanor of the witnesses, could reasonably have accepted complainant's testimony and rejected the alibi presented by the testimony of defendant's family and close friends. The alibi was not substantiated by any objective criteria and was weakened by the testimony of Sheila Moore, who believed her birthday party was not held on March 29. Furthermore, it was well within the function of the jury to believe complainant's testimony that she had seen defendant at 9:30 p.m. on March 23 at her home where there was no specific evidence placing defendant at the Salvation Army store at that particular time. Although defendant may have been at the store at 9 a.m. that morning, there was nothing to prevent him from making a brief visit to complainant's home, which was nearby. Accordingly, we cannot say that the evidence was so improbable as to raise a reasonable doubt of defendant's guilt.

■■ Defendant contends next that his right to counsel was violated where the testimony of Legate, the informant, as to incriminating statements made by defendant, was procured by the government's undisclosed monitoring of defendant's conversations with Legate while they shared a jail cell. As support for his position, defendant relies upon *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199. In *Massiah*, the co-defendant of the accused, who had been released on bail, consented to a Federal agent placing an electronic listening device in co-defendant's automobile. The agent then had the opportunity to listen and record incriminating statements made by the accused to the co-defendant, which statements were introduced at trial. The United States Supreme Court reversed the conviction, holding that the admission of these statements at trial deprived the defendant of his right to counsel. The underlying rationale of the holding was that these statements had been "deliberately elicited" from defendant by Federal agents "after he had been indicted and in the absence of his counsel." In interpreting this decision and its progeny, our supreme court has indicated that *Massiah* " 'applies to exclude post-indictment incriminating statements of an accused to government agents in the absence of counsel even when not deliberately elicited by interrogation or induced by misapprehension engendered by trickery or deception.' " (*People v. Milani* (1968), 39 Ill. 2d 22, 27, 233 N.E.2d 398, 402, *cert. denied* (1968), 393 U.S. 865, 21 L. Ed. 2d 134, 89 S. Ct. 148 (quoting from *Hancock v. White* (1st Cir. 1967), 378 F.2d 479, 482).) In *Milani*, the defendant, while in jail and following

his indictment, made an incriminating statement to a jail-mate, who then gave this information to Federal agents. Thereafter, at the request of the agents, the jail-mate reported the contents of each subsequent conversation he had with defendant. The supreme court, in ruling that the confession made by defendant prior to the time the informer had any discussion with the agents was admissible, distinguished *Massiah* on the grounds that defendant "volunteered a confession of his criminal acts to his confidant who was at the time of the initial discussion in no way associated with the investigative authorities." (39 Ill. 2d 22, 26, 233 N.E.2d 398, 401.) The court further noted:

> "[T]he testimony of informer Devens related to a confession made by Milani before the witness had any connection with the Federal Bureau of Investigation, and we do not believe that Devens's testimony recounting the contents of Milani's original confession became tainted because of the informer's subsequent relationship with the federal agents. This case is decisively dissimilar from *Massiah* in that the informer here was not placed in geographic proximity with the indicted defendant by prosecution agents who sought to surreptitiously elicit self-incriminating admissions in the absence of defense counsel. * * * The *Massiah* case 'did not intend to hold that all those to whom indicted persons made admissions become *ipso facto* government agents and that nobody to whom defendants in criminal cases make incriminating statements can testify to those statements unless counsel was present when the statements were made.'" (39 Ill. 2d 22, 27-28, 233 N.E.2d 398, 402.)

See also *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848. ■ In the present case, there is no evidence in the record that the incriminating statements of defendant were made at any other time than prior to the assistant state's attorney's initial contact with Legate regarding defendant's activities, or were elicited either directly or indirectly by the prosecution. Accordingly, we find *Milani* rather than *Massiah* controlling and therefore hold that the statements made by defendant to Legate did not constitute "undisclosed government monitoring" and violate his right to counsel.

■ Defendant also assigns as error the prosecutor's explanation of the concept of reasonable doubt during closing argument. The argument is as follows:

> "Mr. Trone [Assistant State's Attorney]: Now, the court will instruct you that the State has the burden of proving the Defendant guilty, beyond a reasonable doubt. Now, that instruction does not say that the State has the burden of proving the defendant guilty, beyond all doubt. The State has the burden of proving, beyond a

reasonable doubt. You cannot acquit the Defendant on a doubt, which is based upon speculation or conjecture———

Mr. Moorman [defense counsel]: Your Honor, I believe he's going into the law, and that should be for the Court * * *

        ❋ ❋ ❋

Court: Objection overruled.

        ❋ ❋ ❋

Mr. Trone: A doubt which would be based upon supposition, on speculation, or conjecture, is not a reasonable doubt. You would have to have a reasonable doubt."

It is well established that the concept of reasonable doubt requires no definition and that an involved instruction on that concept may be reversible error. (*People v. Cagle* (1969), 41 Ill. 2d 528, 244 N.E.2d 200.) It follows that counsel, during closing argument, should likewise not attempt to define or elaborate upon its meaning. (*People v. Marino* (1972), 5 Ill. App. 3d 778, 284 N.E.2d 54; *People v. Malone* (1970), 126 Ill. App. 2d 265, 261 N.E.2d 776.) Although the comments were improper, we do not believe that they constituted reversible error in the present context. The comments were not involved (see *People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903) or likely to mislead the jury (see *People v. Amos* (1977), 46 Ill. App. 3d 899, 361 N.E.2d 861); nor did the trial court compound the error by giving an improper instruction (*People v. Amos*).

■■ Defendant further argues that the trial court erred in sentencing defendant to an extended term of imprisonment on the charges of rape and attempt (murder) because the aggravating factors set forth in the Unified Code of Corrections (see Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b)) necessary to impose an extended term were not alleged in the information. We disagree. This same argument was raised and rejected in our recent decision of *People v. Butler* (1979), 78 Ill. App. 3d 809. We note as did Judge Harrison in *Butler* that under the Unified Code of Corrections, there is no requirement that these factors be charged in the information or indictment or proved during the course of trial. To interpret these legislative provisions otherwise, we believe, could result in serious prejudice to defendant's case as there would be the danger of the jury convicting the accused on the basis of the aggravating factors, and not on the crime alleged. Furthermore, as stated in *Butler*, it is clear that the factors are to be considered only "as reasons to impose an extended term sentence" (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b)), and are not elements of the underlying substantive offense. (Compare *People v. Ostrand* (1966), 35 Ill. 2d 520, 221 N.E.2d 499; *People v. Breitweiser* (1976), 44 Ill. App. 3d 284, 357 N.E.2d 890.) We therefore hold that the factors set forth in section 5—5—3.2(b) of the Unified Code of Corrections need not be alleged in the information.

■■ Defendant also argues that the trial court erred in imposing an extended term because, in his opinion, the court must find both aggravating factors (1) and (2) set forth in section 5—5—3.2(b) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b)) to be present. Again, this contention was raised in *Butler* and dismissed as lacking in merit. To justify the imposition of an extended term upon an offender who was at least 17 years old at the time the crime was committed, the court must consider the following factors:

> "(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; *or* (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Emphasis added.) (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b).)

At the sentencing hearing, the court found the second statutory "heinous behavior" factor to be present and sentenced defendant to an extended term of 60 years for both the rape and attempt (murder) convictions. Defendant argues, as did defendant in *Butler*, that an extended term can be imposed only if both factors under section 5—5—3.2(b) are shown to exist because under section 5—8—2 of the Code (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—2) the court may sentence an offender to an extended term only when "the *factors* in aggravation set forth in paragraph (b) of section 5—5—3.2 were found to be present." (Emphasis added.) Defendant's interpretation of the above statutory language is patently incorrect. The factors listed in section 5—5—3.2(b) are stated in the disjunctive, indicating that the court may impose an extended term when either one or both of the aggravating factors are present. (*People v. Butler*; *People v. Warfel* (1979), 67 Ill. App. 3d 620, 385 N.E.2d 175.) The word "factors," as set forth in section 5—8—2, was not intended to alter this meaning and was apparently used in the plural because factors (1) and (2) each have various component parts.

For the foregoing reasons, the judgment of the Circuit Court of Madison County is affirmed.

Affirmed.

JONES, P. J., and KASSERMAN, J., concur.