THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MONROE LAMPKIN, Defendant-Appellant.

Third District   No. 3—85—0369

Opinion filed January 26, 1990.

Frank W. Ralph, of State Appellate Defender's Office, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and James R. Benson, State's Attorney, of Paxton (Marcia L. Friedl, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

Following a jury trial, the defendant, Monroe Lampkin, was found guilty of the murders of Illinois State trooper Michael McCar-

ter, McCarter's brother-in-law Donald Vice and Paxton police officer William Caisse. He was sentenced to three concurrent terms of imprisonment for natural life. We reverse and remand for a new trial.

The defendant's previous conviction for these murders was reversed, his death sentence vacated and the cause remanded for a new trial by the Illinois Supreme Court because inadmissible evidence was presented at the defendant's first trial. (*People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 50.) The facts are adequately set forth in the supreme court opinion; however, those facts necessary to the reaching of our decision on the issues presented will be set forth.

On the evening of April 7, 1979, Illinois State trooper Michael McCarter and Paxton police officer William Caisse stopped four vehicles along a stretch of Interstate 57. Donald Vice, McCarter's brother-in-law, was a passenger in trooper McCarter's unmarked car. McCarter and Caisse managed to stop three of the vehicles just south of the Paxton exit. After a conversation and exchange of documents between McCarter and Caisse, Caisse stayed with the three stopped vehicles, while McCarter, accompanied by Vice, proceeded south after a Ford Thunderbird which had not stopped. The defendant was apparently in the Thunderbird. The record shows that the Thunderbird pulled off on the shoulder about a mile further south, just south of the County Road 17 overpass. McCarter pulled his vehicle up behind the Thunderbird, also just south of the the overpass.

A recording of radio transmissions, played at trial, shows that at approximately 9:01 p.m. McCarter radioed Caisse to bring the other vehicles south to McCarter's location. McCarter stated that he had a subject giving him a hard time. Approximately a minute and a half later, McCarter is heard to say, "I'm shot, I'm shot."

Shortly thereafter Caisse and the other three vehicles pulled up on the shoulder just north of the County Road 17 overpass in the following order: a red pickup truck with a covered bed, a van, a Buick and Caisse's squad car. As they pulled up, a couple in the van saw flashes and heard gunshots coming from near the top of the overpass. McCarter walked hurriedly passed their vehicle back to Caisse's squad car. McCarter then walked back south to the overpass. Caisse pulled his squad car up under the overpass in front of the red pickup truck. The couple saw Caisse assist McCarter into the front passenger seat of Caisse's squad. At about this time, David and Clyde Lampkin got out of the pickup and walked toward the overpass. They were waived back by the officers.

After McCarter was placed in Caisse's car, Paxton police officer

Larry Hale arrived on the scene and parked at the north end of the line of vehicles behind the Buick. He ran up to Caisse's squad, and as he did so he saw two muzzle flashes coming from the south side of the overpass near the top. He returned fire with his pistol. At trial, Hale agreed that he made a statement while in the hospital a few days after this incident, in which he said that after he fired his weapon, Caisse came from around the south end of the pillar which supports the overpass and asked Hale what he was shooting at. Hale reached inside Caisse's squad in order to pop the trunk, spoke with McCarter briefly and then went to the trunk and removed a rifle, handing it to Caisse. Hale returned to his vehicle to radio for more assistance and to retrieve his own rifle and bulletproof vest.

Meanwhile the couple in the van observed David Lampkin again get out of the pickup, walk to the rear of the vehicle and get into the back of the pickup, closing the camper top behind him. David Lampkin emerged from the back of the pickup, looked around, and pulled a rifle from the back of the pickup. He stepped to the left side of the pickup and fired at Caisse, who was standing next the passenger side of his squad car. Caisse immediately fell to the ground. David then walked up to where McCarter was seated in Caisse's car and fired a shot into McCarter. The van then pulled out and drove to Rantoul.

Hale having retrieved his rifle and vest from the trunk of his car walked back toward the overpass. He stopped at the Buick and asked the driver what he was doing there. At about this time, David Lampkin approached Hale and shot him in the leg. In the exchange of gunfire that followed, Hale was injured and David was killed. The Buick drove away during the exchange of gunfire.

Within moments other officers and emergency personnel arrived on the scene. David Lampkin was found dead on the shoulder of the road. Clyde Lampkin was found standing near David's body and was arrested. Further south, the body of Caisse was found on the ground near his squad car. McCarter was found dead in the front passenger seat of Caisse's squad. The body of Donald Vice was found on the ground near the open back passenger door of McCarter's unmarked car. Cleveland Lampkin was found fatally wounded lying in the front passenger seat of McCarter's car. Cleveland's lower body, legs and feet were hanging outside the open door. The defendant was arrested 26 hours later outside Paxton and stated to arresting officers that he had been shot by a trooper. The defendant had a bullet wound to the left wrist.

The evidence presented at trial showed that both McCarter and

Vice were shot by a weapon firing .38 caliber ammunition. A live .38 caliber bullet was recovered from the front seat of the Thunderbird. Other live .38 caliber shells and casings were recovered from a grassy area on a hill on the west side of Interstate 57, just south of the County Road 17 overpass. Some of these shells and casings had blood on them. Still other .38 caliber shells and casings were recovered on County Road 17 near the western end of the bridge. A .38 caliber bullet which passed through McCarter's body was discovered in McCarter's clothing. None of the weapons recovered on the scene were found to have fired these bullets.

On appeal, the defendant contends his conviction must be reversed and the cause remanded for a new trial because the trial court erred in allowing the hypnotically enhanced testimony of a State witness. In a supplemental argument, the State argues that the defendant has waived this issue by failing to raise it in the written post-trial motion. We, however, choose to address the issue as plain error (107 Ill. 2d R. 615(a)).

Over defense counsel's objection, the State was allowed to present the testimony of William Brinegar. At trial, Brinegar testified that he and his wife were returning from Rantoul around 9 p.m. on April 7, 1979. As they drove north on Route 45 toward Paxton, they noted flashing red lights on Interstate 57, which at that point runs parallel to Route 45. When Brinegar reached County Road 17, he turned left and drove up on the overpass over 57. He stopped in the westbound lane of 17, near the west end of the bridge. He exited his vehicle, leaving the door open, and walked to the south side of the bridge. He looked down onto the southbound lanes of the Interstate and noted two cars parked on the shoulder. The car farthest to the south was a light-colored Thunderbird, with the driver's door open. Brinegar noted that the glass in that door was broken.

Brinegar also noticed a dark-colored car parked behind the Thunderbird. Both the front and back doors on the passenger's side of the vehicle were open. In the front doorway, Brinegar observed a man sitting on the ground with his head resting against the door post or front seat. He testified that he believes he saw this person move a few times. The man's left arm was over his chest, and his right arm was down to his side. When Brinegar was shown an autopsy photograph of Cleveland Lampkin and asked if he recognized the person, Brinegar responded, "Not entirely, it looks like the subject I saw." (We note that at the first trial when Brinegar was shown a photo of Cleveland he responded, "That was the man that was lying along the side of the car. *** He was sitting in a sitting position, his head and

shoulders on the seat of the car.")

Brinegar noticed also the body of a man lying on the ground near the back door of the same car. The person's head was facing north. He could not determine how this person was dressed. Brinegar then heard a "pop," and on hearing two more "pops" realized that they were gunshots. He returned to his car and heard four or five more shots as he drove away.

The record shows that on the morning of April 8, 1979, Brinegar gave a statement to Illinois Department of Law Enforcement (IDLE) agents John Sandusky and Floyd Aper. Sandusky made a written report of the statement. Two days later Brinegar and his wife underwent hypnosis. Brinegar was hypnotized by Agent Connell Smith of the IDLE at a motel near Paxton. Agent Aper was the only other person present at the tape-recorded interview.

In a pretrial motion *in limine* and again at trial, defense counsel objected to the admissibility of Brinegar's testimony. The trial court denied the motions, stating at the pretrial hearing that the ruling of the Illinois Appellate Court at that time was that such testimony was not *per se* inadmissible. However, the trial court stated that some foundation as to the expertise of the person conducting the hypnosis would have to be established.

■ At the time of trial in 1985, two cases set forth a four-part requirement for the laying of a foundation for the admitting of hypnotically "refreshed" testimony. (*People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848; *People v. Gibson* (1983), 117 Ill. App. 3d 270, 452 N.E.2d 1368.) These cases were discussed during the arguments on defendant's motions *in limine*.

*Smrekar* concerned the use of hypnosis prior to the positive identification of a defendant by a witness. The *Smrekar* court established four criteria to be met before such testimony is admissible: (1) the hypnotist must be shown to be competent; (2) the evidence must indicate that suggestion was not used in the hypnosis; (3) the identification is corroborated by other substantial evidence unknown to the witness at the time the positive identification is made; and (4) the evidence must show that at the time of the occurrence, the witness had ample opportunity to view the defendant. *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 388, 385 N.E.2d 848, 855.

*Gibson* also involved the use of hypnosis to help a witness identify a defendant. The *Gibson* court held that as part of the requirement that the hypnotist be competent, the hypnotist must be independent and not closely associated with either the prosecution or the defense. In *Gibson*, the court found that the State had failed to sat-

isfy the competence requirement of *Smrekar*. The hypnotist's training was the result of one week at a police school, and he had used hypnosis in actual interviews only two or three times before the interview in *Gibson*. In addition, the fact that the hypnotist was an investigative officer meant that the hypnotist was not "disinterested in procuring the success of the identification." The *Gibson* court went on to find, however, that based on the other evidence in the case, the admittance of the hypnotically refreshed testimony was harmless error.

■■ In the instant case, the hypnotist was an investigative agent with the Illinois Department of Law Enforcement. His training as a hypnotist consisted of a four-day, 30-hour seminar. He had used the technique 18 times prior to the interview of Brinegar. The only other person present at Brinegar's hypnotic interview was also an IDLE agent. Brinegar admitted during an *in camera* interview that in the three days between the incident and the interview he had read about the incident in the newspaper and listened to radio and television. We find that under the criteria set forth in *Smrekar* and *Gibson* the State failed to establish a proper foundation for the hypnotically refreshed testimony of William Brinegar and that it was error to admit his testimony under the law at the time of trial.

In addition, the Illinois Supreme Court has recently ruled that the hypnotically induced testimony of a witness other than a criminal defendant is inadmissible *per se*. (*People v. Zayas* (1989), 131 Ill. 2d 284, 546 N.E.2d 513.) The ruling in *Zayas* applies to all cases, such as the instant case, which are still on direct appeal.

■■ On review of the record and in light of the nature of this case, we do not find that the admission of this testimony was harmless error. None of the witnesses positively identified the defendant as the person firing the gun from the overpass or even being at the scene. The entire case against the defendant was based on circumstantial evidence. Brinegar was the only witness who could place Cleveland Lampkin near the spot where he was later found at a time when shots were still being fired. We note that while Dr. Ho testified as to the nature of Cleveland's injuries, there was no evidence that he was rendered completely immobile by those injuries. Additionally, Brinegar's testimony was used to support the State's theory that the defendant, by firing from the overpass, distracted the attention of Officer Caisse and allowed David Lampkin to kill Caisse. The evidence against the defendant was not so overwhelming as to render the admission of Brinegar's testimony harmless.

Because this issue may arise on retrial, we note that Brinegar's

prehypnotic recall is not rendered inadmissible by the holding in *Zayas*. However, the State will bear the burden of establishing the nature and extent of Brinegar's prehypnotic recall. (See *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571.) We note that in the report of the initial interview, Brinegar does not mention the race of the individual he sees in the front doorway of McCarter's car. He does not see this person move. Nor is there any indication in the report that Brinegar knew the direction from which the shots he heard were fired.

We shall also briefly discuss the other alleged errors raised on appeal because these issues may again arise on retrial.

▇▇ The defendant contends the trial court erred in allowing Dr. Charles Beckman to testify as to the time in his opinion when Trooper McCarter suffered the fatal wound to his trachea. Beckman, a cardiothoracic surgeon, testified that, after reviewing the autopsy report of Dr. Ho and listening to the tape recording of the radio transmissions, it was his opinion that McCarter suffer the gunshot wound to the neck between the time he radioed Caisse to bring the other vehicles down to his location and when he is heard to say, "I'm shot, I'm shot." The defendant argues that Beckman's testimony was basically in the nature of an experiment and that the State failed to establish Beckman as an expert in "diagnosis by radio."

We do not find the admission of this testimony to be error. Dr. Beckman was simply giving his opinion, based on the facts given to him, that McCarter had sustained the bullet wound to his neck prior to McCarter's last radio transmission. The jury could take this opinion into account along with the evidence that McCarter was seen hurriedly walking to the rear of the line of vehicles and then back up to the overpass after he is alleged to have suffered the fatal wound which pierced his trachea. The defense could also possibly have presented testimony to counter Beckman's opinion.

The defendant also alleges the trial court deprived the defendant of a fair determination of his guilt or innocence when it admitted a large number of "hideous" color photographs into evidence. The State responds that the defendant did not object when many of these photographs were admitted into evidence.

▇▇ If a picture has sufficient probative value it may be admitted in spite of the fact that the photograph may be gruesome or inflammatory. (*People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.) The admission of possibly prejudicial photographs lies within the sound discretion of the trial court. (*People v. Landry* (1977), 54 Ill. App. 3d 159, 368 N.E.2d 1334.) On review of the record, we note

that much of the testimony and evidence in the instant case involved when particular gunshot wounds were sustained by the victims, the paths those bullets took through the bodies and which wounds were fatal. Many of victims were shot at different points in the the incident and by more than one weapon. Therefore, however "hideous" the photographs may be, they were one of the essential components in the jury's determination. Given the nature of this case, the probative value of the photographs outweighed any alleged prejudicial impact, and the trial court did not abuse its discretion in admitting them.

The defendant also alleges that he was denied due process when the State failed to preserve crucial blood evidence.

The record shows that two vials of blood were taken from the bodies of each of the five men who died that night (it appears that three vials of blood were taken from David Lampkin's body). A sample of the defendant's blood was taken around the end of April. Deborah Verges, a technician at the IDLE's Springfield lab, performed a basic ABO test on each of these blood samples. In addition, she forwarded a portion of each blood sample to the Bureau of Toxicology in Chicago.

Verges' test of Cleveland Lampkin's blood performed on April 9, 1979, showed he had type B blood. This finding was independently verified by the test done at the hospital prior to the surgery performed on Cleveland. The defendant's blood was type O. Donald Vice and David Lampkin's blood were also found to be type O. McCarter was type A. The samples taken from Caisse were found to have "lysed" and could not be tested. Blood taken from the clothing of Caisse tested positive for the presence of type A and type B blood. Samples taken from the concrete pillar and from bullets found on the hill tested type O. A hat found near these bullets had type A and type B blood on it.

A second lab technician, Parmod Dhawan, also tested some of the samples and, though it is not clear from the record, some inconsistencies with Verges' findings were apparently found. We note Dhawan did not testify for either the prosecution or the defense, although certain problems regarding Dhawan's report were presented to the jury to some extent. It appears that by the end of the summer of 1979 none of the whole blood samples had been properly preserved so that they could be further tested. Mark Stolorow, a third technician at IDLE, was later able to test the sample taken from the concrete pillar.

Of the five samples sent to Chicago, two were tested for drugs

and alcohol. The results were negative. The samples were then placed in the Bureau's freezer. On July 9, 1979, the Bureau sent written notice to the lab in Springfield that because of a shortage of freezer space the blood samples would be destroyed, unless the Bureau was instructed otherwise. The samples were thrown out on August 10, 1979. Approximately one week after the samples were destroyed the Bureau received a phone call, purportedly from the Attorney General's office, asking if the samples still existed.

Because of the manner in which the samples were handled they could never be further tested by the defendant's own experts or by the State. At least three person present that night had type O blood and yet further subcategorization of the blood samples was rendered impossible. We note the evidence regarding blood samples taken from various persons and items found at the scene was substantially the same as that presented in defendant's first trial. The Illinois Supreme Court in its opinion was concerned, however, with Dhawan's report, the report's delivery to the defense and its presentation to the jury. From the discussion in the opinion it appears the supreme court believed the blood evidence admissible in this case.

■■■ In recent years the United States Supreme Court has addressed the issue of the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants. (*California v. Trombetta* (1984), 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528; *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333.) The Court stated in *Trombetta*: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984), 467 U.S. 479, 488-89, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534.) In addition, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process. (*Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333.) In the instant case, there has been no showing of bad faith on the part of the State, although the record does reflect a fair amount of negligence in the handling of the blood evidence. The defense was free to point out to the jury that it could not independently test the IDLE's findings. The jury could consider this fact in deciding what

weight to give the blood evidence. Accordingly, we find the trial court did not err in admitting the blood evidence.

However, because the trial court erred in admitting the testimony of William Brinegar, the judgment of the circuit court of Kankakee County is reversed and the cause remanded for a new trial consistent with this opinion.

Reversed and remanded.

HEIPLE, P.J., and BARRY, J., concur.