Leatrice LITTLE, Appellant,

v.

Bill ARMONTROUT, Appellee.

No. 86–1278.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 12, 1986.

Decided May 6, 1987.

Rehearing Granted Aug. 5, 1987.*

* See 825 F.2d 184.

Toby H. Hollander, St. Louis, Mo., for appellant.

Stephen D. Hawke, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before HEANEY, Circuit Judge, and GIBSON, Floyd R., Senior Circuit Judge, and HUNTER,* Senior District Judge.

ELMO B. HUNTER, Senior District Judge.

Appellant-Petitioner Leatrice Little appeals the summary dismissal of his petition for a writ of habeas corpus, 28 U.S.C. § 2254, by the United States District Court for the Eastern District of Missouri. Little

---

* The HONORABLE ELMO B. HUNTER, Senior United States District Judge for the Western District of Missouri, sitting by special designation.

1. The other points raised by Little on this appeal are:
   (1) the pretrial hypnosis of the victim violated his sixth amendment right to confront witnesses against him;
   (2) the state's deliberate erasure of the audio tape of the victim's first hypnotic session vio-

contends that he is confined in state custody in violation of his Constitutional rights. This court has jurisdiction pursuant to 28 U.S.C. § 2253.

We reverse the district court's dismissal of Little's Petition and grant a Writ of Habeas Corpus. We hold that Little's right to due process of law guaranteed by the fourteenth amendment was violated by admitting the victim's posthypnotic identification testimony into evidence at trial. Because of our holding, we do not reach the merits of the other three issues asserted by Little in this appeal.[1]

## I. FACTS

On the evening of August 13, 1980, the victim, M.B.G., was raped in her apartment in Cape Girardeau, Missouri. Her assailant entered her apartment through a window, hid in a closet and attacked her when she opened the closet doors. The assailant was wearing one of M.B.G.'s blouses wrapped around his head and another of her blouses around his torso.

M.B.G., in an attempt to escape, fled to her living room. Before she could open her front door, the assailant grabbed her from behind and pulled her away from the door. A struggle ensued. Eventually M.B.G. was thrown onto a chair and raped. During the struggle, M.B.G. noticed that the assailant's hands were black. She later told her sister that the blouse wrapped around her assailant's head had slipped off for anywhere from two to sixty seconds. During this time, she was able to view a partial right profile of his face including, "his cheekbone, his jaw, his lips, his nose, [and] his eye".

lated his fourteenth amendment right to due process of law and his sixth amendment right to effective assistance of counsel; and
   (3) the trial court's refusal to appoint a forensic hypnotist violated his sixth amendment right to effective assistance of counsel and his fourteenth amendment right to equal protection of the laws.
Little dropped a fifth issue prior to oral argument.

A policewoman, responding to M.B.G.'s screams for help, interrupted the attack when she knocked at M.B.G.'s door. By the time M.B.G. was able to open her apartment door, her assailant had fled through an open window. M.B.G. described the assailant to the policewoman as a young, broad-shouldered black man with a slender body, 16 to 20 years of age, weighing 145 pounds and approximately 5 feet 7 inches tall.

Another officer, Lieutenant Ross, who was patrolling the area, heard about the rape on a police broadcast. At approximately the same time, he saw a man resembling M.B.G.'s description of the rapist approaching on the sidewalk. Lieutenant Ross slowed his patrol car and then turned it around to talk with the man. The man on the sidewalk, however, ran down an alley and Lieutenant Ross was unable to locate him.

Two days later, on August 15, 1980, M.B.G. was hypnotized by Officer B.J. Lincecum of the Cape Girardeau Police Department. The session lasted several hours. The purpose of the session was to enhance M.B.G.'s recall of the identity of her assailant. M.B.G. was unable, under hypnosis, to add any detail to the description she had previously given of the assailant. An audio tape was made of the session, but it was erased fifteen days later pursuant to departmental policy.

M.B.G. viewed photographic displays on October 16, November 5, and November 10, 1980, in an attempt to identify her assailant. Little's picture was not included in any of these displays. During the October 16, 1980, photographic display, M.B.G. picked out a picture of someone other than Little who she thought resembled her assailant.

Sometime during December, 1980, M.B.G. was hypnotized, for a second time, by Officer Lincecum. M.B.G. testified that she underwent hypnosis this time because she was having difficulty sleeping. Officer Lincecum testified that the case was not discussed during the hypnotic session. There was no record made of this session.[2]

She next was shown photographic displays on December 23, 1980. Little had become a suspect in the rape sometime in November or December. She picked Little's picture out of the display. Between December 25 and 31, 1980, she was shown two more photographs, one of Little alone and the other showing him prominently in a group shot. She again identified him as the assailant. On January 26, 1981, M.B.G. viewed a body lineup of six persons. She immediately eliminated all but two of the persons. She then picked Little out as the rapist after viewing his right profile.

Little was convicted of rape, § 566.030.1 R.S.Mo.1978, and burglary, § 569.160 R.S. Mo.1978, after a jury trial in the Circuit Court of Cape Girardeau County, Missouri. He was sentenced to consecutive terms of twenty years on the rape conviction and five years on the burglary conviction. The Missouri Court of Appeals for the Eastern District of Missouri reversed the convictions and remanded the case for a new trial. That court, because of a perceived conflict with a case from the Western District Court of Appeals,[3] certified the case for transfer to the Missouri Supreme Court. The Missouri Supreme Court affirmed Little's conviction holding that he had failed to prove that the identification testimony was tainted by impermissible suggestion. *State v. Little*, 674 S.W.2d 541, 542 (Mo.1984) (banc), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985).[4]

2. It should be noted that Officer Lincecum stated that during the training course he attended he was taught not to use hypnosis for therapeutic purposes.

3. The Western District Court of Appeals case was *State v. Greer*, 609 S.W.2d 423 (Mo.Ct.App. 1980), *vacated on other grounds*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981).

4. The Missouri Supreme Court, since the *Little* decision, has declined to follow *Greer*, which held that hypnosis affects credibility but not admissibility. The Court in *Alsbach v. Bader*, 700 S.W.2d 823 (Mo.1985) (banc), adopted the per se inadmissible approach for hypnotically-enhanced testimony. The Court concluded that the use of hypnosis to aid recall does not meet the requirements of Missouri's version of the *Frye* test. *Id.* at 824. The Court further noted

As mentioned, Officer Lincecum of the Cape Girardeau Police Department conducted both of the hypnotic sessions of M.B.G. He joined the department in 1976. His training in hypnosis consists of a four-day class conducted by Dr. Martin Reiser[5] of the Law Enforcement Hypnosis Institute, Inc. The class met for eight to nine hours a day and involved some practical exercises where the students were divided into groups and took turns playing the roles of hypnotist, subject, and observer. This four-day course was Lincecum's only training in the field of hypnosis. M.B.G. was the 27th subject that Lincecum had hypnotized since his training course. In conjunction with the case, Officer Lincecum also hypnotized three other persons.[6] When hypnotizing the victim, Officer Lincecum utilized the third person or "TV screen" technique. This technique asks the subject to view the event as though it was occurring on a television screen. This apparently allows the subject to stop the event and focus in on any specific details that are in question.

Since no record was kept of either hypnotic session, both the trial court and petitioner Little were forced to rely on the testimony of those present at each session to determine what happened during each session. M.B.G., her sister, and Officer Lincecum were the only persons present during the entire first hypnotic session. Officer Geracke, a special officer with the department for the investigation of rape cases, was in and out of the room during the session. Each of these persons testified that Lincecum did not suggest a description of the rapist during the session. Officer Lincecum did tell M.B.G. during the first session that she would see the event as it was happening and that she would be able to remember what she wanted to. As noted, Officer Lincecum testified that the case was not discussed in the second session.

## II.  EXHAUSTION

The State contends that Little failed to exhaust all of his habeas claims in state court.[7] Thus, it argues that Little had a mixed petition of exhausted and unexhausted claims which the district court properly dismissed. *See Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). We disagree with this characterization of the Petition.

■ To exhaust his state remedies a habeas petitioner only needs to have " 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim[s]." *See Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 75 L.Ed.2d 3 (1982) (per curiam); *see also Picard v. Conner*, 404 U.S. 270, 276–77, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971). We have examined each of the four claims asserted by Little in his Petition and find that each was either expressly raised by him in state court proceedings or discussed by the state courts. Thus, Little provided the state courts with a "fair opportunity" to rule upon each of the four claims presented in his Petition.

that much of the authority in *Greer* cited by the Missouri Court of Appeals for the proposition that hypnosis affects credibility but not admissibility has been overruled.

5.  Dr. Reiser is the Director of Behavioral Science Services of the Los Angeles Police Department. Law Enforcement Hypnosis Institute, Inc., is a proprietary school in Los Angeles that teaches courses in hypnosis to police and other law enforcement personnel. He has testified in a number of criminal trials as a proponent of hypnotically aided recall. *See State v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 266, 723 P.2d 1354, 1377 (1982).

6.  He also hypnotized Joe Mosby, a maintenance man at the victim's apartment; Lieutenant Ross,

the police officer who shortly after the attack saw a jogger slightly fitting the victim's initial description of her assailant; and Gary Niswonger, a Southeast Missouri State University campus security guard who saw a man at a quick market in October who resembled a police composite of the assailant. There is nothing in the record that indicates how the composite came into existence.

7.  This issue is being raised for the first time on appeal because the district court dismissed the Petition on the merits without requiring the state to respond to the Petitioner's application for habeas corpus relief.

## III. HYPNOSIS

As mentioned, the first issue raised by Little is that his fourteenth amendment right to due process of law was violated by the admission of the victim's posthypnotic identification testimony. Before directly addressing that question, we will first discuss some of the problems associated with using hypnotically-enhanced testimony and then look at the various approaches adopted by courts to deal with such testimony.

### A. Problems Associated with Hypnosis

Two theories have been hypothesized regarding the human memory and its interaction with hypnosis. One is the retrieval theory. A chief proponent of this theory is Dr. Martin Reiser, the person who taught hypnosis to Officer Lincecum. The basic tenet of this theory is that the human memory accurately records and stores the details of each experience. The use of hypnosis allows the subject to reach back in his memory and recall additional details. M. Reiser, *Handbook of Investigative Hypnosis* (1980). Proponents of this theory analogize the human memory to a video recorder "capable of 'playing back' the exact images or impressions it has received." *People v. Shirley*, 641 P.2d 775, 781 repub. 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354 (Cal. 1982). This theory is rejected by many scientists who work in the field. *See* F. Bartlett, *Remembering*, (1932, reprinted 1964); D. Hintzman, *The Psychology of Learning and Memory* (1978); F. Loftus, *Eyewitness Testimony* (1979); see also testimony of Dr. Donald W. Shafer in *People v. Shirley*, 641 P.2d at 781.

The second is the construction theory. The basic tenet of this theory is that the memory of any given event is constructed of and influenced by many factors. F. Bartlett, *Remembering* 213 (1932, reprint-ed 1964). The memory of an event is re-constructed based on a person's perception of the event in relation to other experiences. *Id.* at 213. Proponents of this theory argue that "the past is being continually remade [and] reconstructed in the interest of the present." *Id.* at 309. Thus, the operation of memory recall often produces erroneous responses. F. Loftus, *Eyewitness Testimony* 86–87. In a comprehensive review of the clinical data concerning the use of hypnosis as an aid to recall,[8] Dr. Martin Orne, a major proponent of this theory, emphasized that the use of hypnosis exacerbates the problems of normal recall.[9] His research indicates that hypnotically "refreshed" subjects tend to be even more responsive to leading questions, resulting in more error and, as a result of the hypnotic process, more subjectively confident in the accuracy of their recall. Experts have identified several specific problems associated with hypnotically stimulated recall and its accuracy. These problems include suggestibility, confabulation, pseudomemory, memory hardening, source amnesia, and a loss of critical judgment.

A person in a hypnotic trance is subject to a heightened degree of suggestibility. The source of the suggestion could be subtle verbal or nonverbal cues given by the hypnotist of which even he is not aware. The form of the suggestion can vary from the hypnotist's voice inflection, body movement or the form of the question. Additionally, any suggestions may be heightened by either the subject's perception that hypnosis will aid in or provide a more accurate recall or by a desire to please the hypnotist. *People v. Shirley*, 641 P.2d at 803.

A second problem associated with hypnotically refreshed recall is "confabulation". Confabulation occurs when an individual fills in details of gaps in his or her memory of an experience. These details,

---

**8.** Orne, Hypnotically Induced Testimony, in *Advances in the Psychology of Eyewitness Testimony* (G.L. Wells & E.F. Loftus, eds.) (Boston Cambridge University Press 1984).

**9.** Dr. Orne argues that hypnosis can either increase the inaccuracy of recollections (through misleading information) without diminishing confidence in these "memories", or it can actually increase confidence in memory reports without also increasing accuracy. The amount of confidence and belief an individual associates with his or her remembrances, he contends, is more a function of hypnotic responsiveness than recall.

while plausible, consist of either irrelevant actual facts taken from an unrelated prior experience or a fantasy. *Shirley,* 641 P.2d at 805; *Harker v. Maryland,* 800 F.2d 437, 440 (4th Cir.1986); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86, 93 (1981). It is impossible for anyone, including the subject or a psychiatrist or psychologist with extensive training in the field of hypnosis, to determine whether a particular piece of information is actual memory or confabulation, absent independent verification such as a record being made of the subject's memory before the hypnosis session. Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int. J. Clinical & Experimental Hypnosis 311, 317–18 (1979).

A third problem, related to the concept of confabulation, is that hypnosis may create a "pseudomemory" in the hypnotized individual. After being hypnotized, the individual believes that his posthypnotic recall of the event accurately reflects the event itself. Thus, he emerges with a false or inaccurate memory of the experience which was the subject matter of the hypnosis session. A recent study found that most information additionally recalled under hypnosis is erroneous. *See* Dwyan & Bowers, *The Use of Hypnosis to Enhance Recall,* 22 Science 184 (1983).[10]

A fourth problem identified by the experts is "memory hardening", a concept which refers to the hypnotized individual's subjective conviction that the memory after hypnosis is accurate. Memory hardening is exacerbated

> by two techniques commonly used by lay hypnotists: before being hypnotized the subject is told (or believes) that hypnosis

will help him to 'remember very clearly everything that happened' in the prior event, and/or during the trance he is given the suggestion that after he awakes he will 'be able to remember' that event equally clearly and comprehensively.[11]

*People v. Shirley,* at 803–04.

The problem of memory hardening is compounded by its interrelationship with the pseudomemory.

> Another problem is source amnesia.

> [T]he police may tell a witness something just before hypnosis and then hypnotize him. When he awakes, his 'source amnesia' may lead him to believe that the police statement was a product of his own memory. Sometimes communications made to the patient after hypnosis may be retroactively integrated into the hypnotic recall. The subject may recall a fact with no awareness that it was not the product of his own mind. Or he may recall being told that fact, but insists that he had prior knowledge of it. This often happens when subjects are shown photographs or lineups for identification just before or just after hypnotic sessions.[12]

Diamond, *Inherent Problems in the Use of Pretrial Hypnosis in a Prospective Witness,* 68 Cal.L.Rev. 313, 336 (1980).

A sixth problem is the subject's loss of critical judgment. An individual loses critical judgment in that he is more apt to speculate about the details of an experience while under hypnosis and later give credence to those details than he would if

---

**10.** Whether hypnosis is an aid to eyewitness identification has been the subject of two recent studies. The conclusion from the first study was that hypnosis had no effect on eyewitness identification. Wagstaff, Traverse & Millner, *Hypnosis and Eyewitness Memory—Two Experimental Analogues,* 10 IRCS Medical Science: Psychology and Psychiatry 894 (1982). The conclusion drawn from the second study, however, was that hypnosis caused significantly more error in eyewitness identification. Sanders & Simmons, *The Use of Hypnosis to Enhance Eyewitness Accuracy: Does it work?,* 68 J.App.Psychol. 70 (1983).

**11.** Such suggestions are recommended by police hypnosis manuals. E.g., Reiser, *Handbook of Investigative Hypnosis,* Ch. 40 (1980). That type of suggestion was given to M.B.G. by Officer Lincecum when he told her that she would see the event as it was happening and be able to remember what she wanted to.

**12.** Source amnesia may be present in this case. M.B.G. first identified Little during a photographic lineup on December 23, 1980. And, while the exact date is not known, her second hypnosis session occurred sometime in December, 1980.

relying on normal memory recall processes.[13]

## B. Treatment of Hypnotically Induced Testimony by the Courts

Three major approaches to the admission of hypnotically-enhanced testimony have been adopted by various courts. The approach adopted by a particular court generally reflects its perception of the degree to which the above-mentioned problems affect a person's memory of an event.

The first approach permits the admission of such testimony. Courts adopting this approach state that hypnosis affects credibility but not admissibility.[14] This approach was announced in the seminal case of *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969). A basic tenet of this approach is that hypnotically-enhanced recall is similar to ordinary recall. Thus, it is assumed that any inaccuracies in the recall testimony can be discovered and cured by skillful cross-examination, the testimony of expert witnesses and the use of carefully drawn cautionary instructions. *See, e.g., Chapman v. State*, 638 P.2d 1280, 1282–84 (Wyo.1982). This approach has become somewhat circumspect since much of the early authority adopting this approach has been overruled either on appeal or by later case law.[15]

The second approach permits the use of hypnotically-enhanced recall as long as the proponent of the testimony establishes compliance with certain procedural safeguards.[16] *State v. Hurd*, 86 N.J. 525, 432 A.2d 86, decided by the New Jersey Supreme Court is the leading case applying this approach. The *Hurd* court set forth the following procedural safeguards: (1) a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session; (2) the hypnotist must be independent of the parties to the lawsuit; (3) any information given to the hypnotist by law enforcement personnel or a party to the action prior to the hypnosis must be recorded; (4) the hypnotist should obtain from the subject a detailed description of the facts as remembered by the subject prior to the hypnosis; (5) all contacts between the hypnotist and the subject must be recorded; and (6) only the hypnotist and the subject should be present during all phases of the hypnotic session. Almost all other jurisdictions adopting this approach have utilized the *Hurd* safeguards or a variable of those safeguards.

The third approach bars the use of hypnotically-enhanced or refreshed testimo-

---

**13.** Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal.L.Rev. 313, 355, 337–338 (1980); Orne, *Use and Misuse* 316–320; Putnam, *Hypnosis and Distortions in Eyewitness Testimony*, 27 Internat.J. Clinical & Experimental Hypnosis 437, 446 (1979). Gibson, *Hypnosis: Its Nature and Therapeutic Uses* 58–59 (1977); Hilgard, *Hypnotic Suggestibility* 9 (1965); Hull, *Hypnosis and Suggestibility* 111–115 (1933).

**14.** See *Clay v. Vose*, 771 F.2d 1 (1st Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986); *United States v. Awkard*, 597 F.2d 667 (9th Cir.1979), *cert. denied*, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Adams*, 581 F.2d 193 (9th Cir.1978), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *United States v. Narciso*, 446 F.Supp. 252 (E.D.Mich.1977); *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974); *State v. Wren*, 425 So.2d 756 (La.1983); *State v. Brown*, 337 N.W.2d 138 (N.D.1983); *State v. Glebock*, 616 S.W.2d 897 (Tenn.Crim.App.1981); and *Chapman v. State*, 638 F.2d 1380 (Wyo.1982).

**15.** See *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), *cert. denied*, 395 U.S. 949, 89 S.Ct. 200, 23 L.Ed.2d 468 (1969), overruled by *Collins v. State*, 52 Md.App. 186, 447 A.2d 1272 (1982), *aff'd*, 296 Md. 670, 464 A.2d 1028 (1983); *People v. Hughes*, 99 Misc.2d 863, 417 N.Y.S.2d 643 (1979), overruled by *People v. Hughes*, 88 A.D.2d 17, 452 N.Y.S.2d 929 (N.Y.App.Div.1982); and *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978), overruled by *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984).

**16.** See *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112 (8th Cir.1985); *United States v. Valdez*, 722 F.2d 1196 (5th Cir.1984) (inadmissible per se under facts of case); *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984); *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981); *State v. Beachum*, 97 N.M. 682, 643 P.2d 246 (1981); *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386, *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983). Oregon has adopted by statute similar procedural requirements. *See* Or.Rev. Stat. § 136.675 (1981).

ny.[17] Many of the courts holding that hypnotically-aided recall is inadmissible per se premise their holding on the *Frye* test as adopted by their jurisdiction. *E.g., People v. Shirley,* 641 P.2d 775; *Alsbach v. Bader,* 700 S.W.2d 823. The *Frye* test generally predicates the admission of evidence based on a scientific theory or principle on that theory or principle having achieved general acceptance in the relevant scientific community. *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). These jurisdictions reject the procedural safeguard approach as being inadequate to protect against many of the dangers inherent in the hypnotic process.[18] Several of the jurisdictions which follow either this or the procedural safeguards approach admit testimony of the prehypnotic memory of the event, or testimony of subjects not covered during the hypnosis even if the posthypnotic testimony is not admissible. *See, e.g., State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982) (banc).

While this is a criminal case of first impression in this circuit, we recently held that in a civil case testimony derived from hypnotically-enhanced recall is admissible if the proponent of the testimony establishes the reliability of that testimony. *Sprynczynatyk v. General Motors ,Corp.,* 771 F.2d 1112 (8th Cir.1985). In *Sprynczynatyk,* we stated that trial courts should consider the following factors when making that determination: (1) whether and to what degree procedural safeguards [19] have been utilized; (2) the appropriateness of using hypnosis for the kind of memory loss involved; and (3) whether there is any evidence to corroborate the hypnotically-enhanced testimony. *Id.* at 1123. If the court determines that the testimony is sufficiently reliable, it must, of course, still consider whether its probative value outweighs its prejudicial effect. *Id.* at 1223.[20]

---

17. *See State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982) (banc); *People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775, *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *People v. Quintanar,* 659 P.2d 710 (Colo.App.1982); *Bundy v. State,* 471 So.2d 9 (Fla.1984); *State v. Seager,* 341 N.W.2d 420 (Iowa 1983) (admits testimony only if sufficiently similar to prehypnotic statements); *State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985); *Collins v. State,* 52 Md.App. 186, 447 A.2d 1272 (1982), *aff'd,* 296 Md. 670, 464 A.2d 104 (1983); *People v. Gonzales,* 108 Mich.App. 145, 310 N.W.2d 306 (1981), *aff'd,* 415 Mich. 615, 329 N.W.2d 743 (1982); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *Alsbach v. Bader,* 700 S.W.2d 823 (Mo.1985) (banc); *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981); *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983); *State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (1984); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981).

18. Virtually all of the safeguards are designed to protect against suggestibility. *Shirley,* 641 P.2d at 787. Thus, there are few, if any, proposed safeguards which protect against such known problems as confabulation, pseudomemory, memory hardening and the loss of critical judgment.

19. *Sprynczynatyk,* 771 F.2d 1112 (8th Cir.1986). The safeguards suggested are:

   (1) The hypnotic session shall be conducted by an impartial licensed psychiatrist or psychologist trained in the use of hypnosis and thus aware of its possible effects on memory so as to aid the prevention of improper suggestions and confabulation. Appointment of the psychiatrist or psychologist should first be approved by the trial court.... (2) Information given to the hypnotist by either party concerning the case should be noted, preferably in written form, so that the extent of information the subject received from the hypnotist may be determined. (3) Before hypnosis, the hypnotist should obtain a detailed description of the facts from the subject, avoiding adding new elements to the subject's description. (4) The session should be recorded so a permanent record is available to ensure against suggestive procedures; Videotape is a preferable method of recordation. (5) Preferably, only the hypnotist and subject should be present during any phase of the hypnotic session, but other persons should be allowed to attend if their attendance can be shown to be essential and steps are taken to prevent their influencing the results of the session.

   *Id.* at 1123 n. 14. After announcing these safeguards, we cautioned that "[i]n adopting this approach we do not hold that if the safeguards were followed the testimony is always admissible, nor do we interpret the rule to mean that if some of the safeguards were not followed the testimony is never admissible. *Id.* at 1123 n. 16.

20. Because of the different burden of proof and constitutional issues present in a criminal case, we do not consider the test announced in *Sprynczynatyk* to necessarily be the test to be applied in criminal cases. However, the *Sprynczynatyk* test and its procedural safeguards do, as implied below, provide helpful guidelines for an inquiry into whether or not

## IV. ADMISSIBILITY OF M.B.G.'s POSTHYPNOTIC IDENTIFICATION TESTIMONY

The linchpin in determining the admissibility of identification testimony in a criminal trial is reliability. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). If the identification procedure used is unduly suggestive, it deprives the defendant of a fair trial and due process of law. *Id.* at 102–14. An identification procedure is impermissibly suggestive if it gives rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The court must determine whether under "the totality of the circumstances" an identification is reliable. *Stovell v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). "Against these factors is to be weighed the corruptive effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253.

M.B.G. testified that for anywhere from 2 to 60 seconds she was able to see a partial right profile of her assailant's face. This allowed her to see his cheekbone, jaw, lips, chin, nose and eye. The rape occurred in the early evening hours of August 13, 1980. Sunlight was coming through the living room window. Thus, M.B.G. had an opportunity to get at least a partial view of her assailant.

M.B.G. identified Little as her assailant from a photo lineup approximately four months after the rape. She later viewed two other photographs of Little and again she identified Little as her assailant. In January of 1981 she picked Little out of an in person lineup. Her identification of him at trial was unequivocal.

On the other hand, M.B.G. testified she avoided staring at her assailant when the blouse slipped off his head for fear of suffering physical harm. Furthermore, while M.B.G. stated that the attack lasted between 35 to 40 minutes, her initial description of the assailant did not fit petitioner. She initially described her assailant as a young, broad-shouldered black, slender body, 145 pounds, 5 feet 7 inches tall, and between the ages of 16–20. Little was 25 years old, 175 pounds and 5 feet 11 inches at the time of the attack. It is important to note that M.B.G. determined her assailant's height by comparison to her own height. M.B.G. is approximately 5 feet 8 inches tall.

While these factors, in some respects, tend to show that M.B.G.'s identification of Little as her assailant was somewhat suspect, alone they do not warrant a finding that her identification testimony was constitutionally unreliable. Moreover, they really are not even necessary to decide this case. The corruptive effect of the suggestive identification procedure, in and of itself, is sufficient to support a finding that M.B.G.'s identification of Little as her assailant, both in the lineups and at trial, is constitutionally unreliable.

The suggestive identification procedure in this case is, of course, the use of hypnosis in an attempt to improve M.B.G.'s recall. As noted, this circuit has not determined whether, under the due process clause of the fourteenth amendment, hypnotically-enhanced testimony can be used by the prosecution in a criminal case or, if allowed, what procedural safeguards must be complied with.[21] And, we do not have to answer those questions to decide this case

the posthypnotic recall of a witness in a criminal case is constitutionally reliable.

**21.** It is obvious from *Sprynczynatzk,* 771 F.2d 1112, that this court rejects the approach that

the fact that a witness has been hypnotized merely goes to the weight and not the admissibility of the testimony.

because the hypnosis of M.B.G. did not include *any* of the procedural safeguards required in jurisdictions which allow hypnotically-enhanced testimony. *See, e.g.* 432 A.2d at 89–80. Thus, even if we were to hold that such testimony was admissible, we would not allow it in this case because of the lack of procedural safeguards.

First and foremost among the problems with the hypnosis of M.B.G. is that no record was kept of either of the sessions. The importance of a record has been noted by many of the courts which have addressed the issue of hypnotically-enhanced identification testimony. *See, e.g., United States v. Adams,* 681 F.2d 193, 199 (9th Cir.1978). Without a record of the session, it is impossible for the court to determine whether any improper suggestions occurred. Moreover, the lack of a record deprives the defendant of a means of attacking the credibility of a witness.[22]

Likewise, no record was kept of what information about the case was given to Officer Lincecum before hypnotizing M.B.G. And, Officer Lincecum did not obtain a detailed description from M.B.G. of her prehypnotic memory before hypnotizing her.

Furthermore, M.B.G. was not hypnotized by an "impartial licensed psychiatrist or psychologist trained in the use of hypnosis and thus aware of its possible effects on memory so as to aid in the prevention of improper suggestions and confabulations." *Sprynczynatyk,* 771 F.2d at 1123 n. 4. Rather, she was hypnotized by a police officer whose only training was a four day seminar on the subject. Also, other persons besides Officer Lincecum and M.B.G. were present during the first session without any explanation as to why their presence was necessary.

In short, every procedural safeguard required by *Hurd* and recommended by this circuit for civil cases in *Sprynczynatyk,* was violated.

Another factor considered important by many courts is corroboration of the posthypnotic testimony. *See Clay v. Vose,* 771 F.2d 1 (1st Cir.1985); *Sprynczynatyk,* 771 F.2d at 1123; *Harker v. Maryland,* 800 F.2d 437 (4th Cir.1986).[23] Without corroborating evidence, it is extremely difficult, if not impossible, to determine whether or not the posthypnotic recall is accurate. M.B.G.'s posthypnotic identification of Little was uncorroborated. She did not identify him in the photographic lineups until after her first hypnotic session. In addition, she was the only witness at trial who positively identified Little as her attacker.[24]

Courts require procedural safeguards and corroborative evidence both to minimize the chance of a subject suffering from the many problems associated with hypnosis and to allow an after the fact evaluation by an expert to determine if the subject is experiencing such problems. M.B.G. could very well be suffering from any or all of the above discussed problems associated with hypnosis. But, the state's failure to follow any procedural safeguards and the lack of corroborating evidence prevents any expert, much less this court, from determining whether she is indeed suffering from such problems, or even if the sessions were conducted in a fair manner. In light of this, her initial photographic identification of Little, which occurred after the first hypnosis session, is tainted. And, because neither the experts nor the courts can unravel M.B.G.'s intertwined prehypnotic and posthypnotic memories, her subsequent identifications of Little are also tainted to such an extent to be constitutionally unreliable. Thus, the state's use of her identification of Little at trial violated his four-

**22.** A video tape of the session would be the preferred method; however, under certain circumstances an audio or stenographic record might be acceptable.

**23.** *See also United States v. Valdez,* 722 F.2d 1196 (5th Cir.1984). In *Valdez,* the Fifth Circuit, while adopting a per se inadmissible approach under the particular facts stated, "[i]f adequate procedural safeguards have been followed, *cor-*

*roborated* posthypnotic testimony might be admissible." *Id.* at 1203 (emphasis added).

**24.** The problem of not having any corroborating evidence is exasperated in this case by Officer Lincecum's failure to make a detailed record of her prehypnotic memory prior to hypnotizing her.

teenth amendment right to due process of law.

## V. CONCLUSION

Our inquiry does not end upon a finding that Little's right to due process was violated by the use of posthypnotic identification testimony. We must still inquire whether this constitutional error amounts to prejudicial error.

The United States Supreme Court has held that a constitutional violation results in prejudicial error "unless it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We have no doubt that the error in this case was not harmless. M.B.G.'s identification testimony was crucial to Little's conviction. Her testimony was the only positive testimony which placed Little at the crime scene. Joe Mosby, the apartment maintenance man, could only tentatively identify Little at trial as the black man he saw around M.B.G.'s apartment on the day of the rape and his tentative identification was also subsequent to being hypnotized by the police. Moreover, there was little physical evidence to corroborate M.B.G.'s identification. An expert testified that a pubic hair found in the victim's panties possessed similar characteristics to that of Little. The expert, however, was unable to determine the race, sex, or bodily origin of the hair. Fingerprints found on the window ledge where the rapist exited the apartment do not match Little's fingerprints. Furthermore, M.B.G.'s initial description of her assailant does not fit Little.

Our decision does not make M.B.G. incompetent as a witness. She may still testify from her prehypnotic memory of the events of the attack as long as it is uncontaminated by the hypnosis. *Sprynczynatyk*, 771 F.2d at 1123; *Valdez*, 722 F.2d at 1204. Thus, she may testify as to "those matters which [s]he was able to recall and relate prior to hypnosis." *Valdez*, 722 F.2d at 1204. To assure that the testimony is in fact her uncontaminated prehypnotic memory it either must have been preserved in written, audio tape or video tape form or be corroborated by some other independent basis. *Valdez*, 722 F.2d at 1204.

We grant petitioner-appellant Little's Petition for a Writ of Habeas Corpus. The state shall have 120 days from this order to either commence a new trial or release Petitioner from custody.