Jimmy Lee BOYKIN, Appellant,

v.

Walter LEAPLEY, Warden, Appellee.

No. 93–1747.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1993.

Decided July 1, 1994.

Michael S. Simpkins, Sioux Falls, SD, argued, for appellant.

Jeffrey P. Halem, Pierre, SD, argued, for appellee.

Before JOHN R. GIBSON * and MORRIS SHEPPARD ARNOLD, Circuit Judges, and HENRY WOODS,** District Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

A jury convicted Jimmy Lee Boykin of first degree murder, kidnapping, and first degree robbery of DeWayne Jensen, and he was sentenced to twenty-five years in prison for the robbery and life in prison for the murder and kidnapping. After exhausting his state remedies, he filed a petition for writ of habeas corpus in federal district court.[1] The district court denied the petition. Boykin is appealing from that denial, and argues that he is entitled to a new trial for seven reasons.

I.

Boykin was indicted for murder, kidnapping, and robbery along with Howard Joseph Adams. Boykin filed a motion to

---

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 1, 1994, before the opinion was filed.

** The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

sever the trials, which the trial court granted. Adams was tried first and convicted. The state tried Boykin under two theories, that Boykin committed the crimes, and that Boykin aided and abetted Adams's commission of the crimes. Boykin argues that he was denied a fair trial because the state presented evidence that Adams was guilty. Evidence of Adams's guilt was properly part of the state's case because of its theory that Boykin had aided and abetted Adams. Boykin made Adams's guilt part of his own case, moreover, when he argued, as early as his opening statement, that Adams had committed the charged offenses. As the Supreme Court of South Dakota found when it reviewed Boykin's state petition for a writ of habeas corpus, Boykin's strategy was, in part, to blame the crime entirely on Adams. *Boykin v. Leapley,* 471 N.W.2d 165, 168 (S.D. 1991). When such a strategy fails, a defendant may not assert that employing that strategy is reversible error. *See Smith v. Jones,* 923 F.2d 588, 590 (8th Cir.1991); *State v. Brown,* 285 N.W.2d 848 (S.D.1979).

## II.

■ Boykin argues that he is entitled to a new trial because during the jury's deliberation there was a conversation between the bailiff and one of the jurors, Janet Johnson, which was overheard by a second juror, Anita Greenhoff, regarding Johnson's question about what would happen if the jury became deadlocked. The bailiff, Sandy Friessen, testified that she made two statements in reply to the juror's question. Friessen testified that she answered Johnson's question by saying:

> Well, if you can't come back in with a decision, the Judge and the attorneys talk it over on how long you have been deliberating, then it's up to them whether to send you back into the jury room and say deliberate some more or they are going to take your answer as whatever you give for an answer.

She testified that she also told Johnson:

> I don't know when you are going to come in with a decision. My guess is that if you're telling me that you're going to come in after lunch and say you can't make a

decision, I think that the Judge would probably send you back into the jury room, you know, and try to talk some more and try to come to a decision.

■ There can be no doubt that such communications were improper under South Dakota law. S.D.C.L. §§ 23A–25–5 & 23A–25–8. It is also clear that in a federal prosecution of a criminal defendant, "any private communication during a trial, directly or indirectly, with a juror about the matter pending before the jury is deemed presumptively prejudicial and the burden is upon the government to show that the contact was harmless." *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *see also United States v. Sublet,* 644 F.2d 737, 740 (8th Cir.1981). We are not convinced, however, that *Remmer* established the rule that any extrajudicial communication with a juror is presumed to deprive a criminal defendant of due process under the Fourteenth Amendment. *Parrott v. Arkansas,* 497 F.2d 1123 (8th Cir.1974). Assuming, however, without deciding, that such is the case, we are convinced that petitioner is not entitled to relief.

The trial court concluded, and Boykin does not dispute, that the first of the two statements, although improper, was not prejudicial. The trial court viewed the second statement as presumptively prejudicial because, that court found, even the court itself, in response to a written note from the jury, could not have given the jury the instruction that the bailiff gave Johnson without first having contacted counsel for both parties. The court gave the state the opportunity to rebut the presumption that the second statement was prejudicial. At a hearing held a few days after the jury had reached its verdict, Johnson testified that she did not remember asking the bailiff about the jury's failing to reach a unanimous verdict, and did not remember the bailiff's saying anything about the judge sending the jury back to deliberate. She said that on the afternoon in question, the first full day of deliberations, she had been suffering from a migraine and had had difficulty concentrating.

Boykin's counsel learned that Greenhoff had overheard the bailiff's conversation with Johnson, and at the invitation of the trial court, presented the court with Greenhoff's affidavit describing what she overheard. Greenhoff stated in her affidavit, signed on the day that Johnson testified, that she recalled that "Johnson ask[ed] Sandy Friessen what would happen if you would have a hung jury, and Sandy Friessen replied 'I think the Judge would make you go back and deliberate some more.'" Greenhoff was never called to testify. After reviewing only the affidavit, the trial court concluded that this did not change the conclusion that the bailiff's statements were not prejudicial.

The distinction between the bailiff's two statements is important. The first statement merely informed Johnson that if the jury could not reach a decision the judge and the attorneys would discuss what to do next: there was no implied pressure to reach a decision. In the second statement, however, the bailiff suggested that the judge would send the jury back to try to reach a decision. We believe that Greenhoff's affidavit indicates that she remembered the second statement: she said that the bailiff had said "the judge would make you go back," a phrase more coercive than "send you back" and, apparently, divorced from a modifying phrase suggesting that the judge and the attorneys would decide whether to send the jury back.

■ We believe that the state has met its burden of proving that the second statement was not prejudicial. The content of the improper communication and the context in which it was given are relevant to a determination of whether the communication was prejudicial. *See, e.g., United States v. Rowley,* 975 F.2d 1357 (8th Cir.1992) (juror who said he knew defendant and witnesses spoke with other jurors about the case before the jury began to deliberate); *United States v. Cheyenne,* 855 F.2d 566 (8th Cir.1988) (jurors consulted a dictionary to define words in the court's instructions). The content and context of the communication in this case reveal that the only prejudice that could have resulted from the bailiff's statements is that the statements may have caused the jury to

reach a verdict that it otherwise would not have reached. First, the bailiff's statement on its face does not seem to us to be coercive. Second, the statement does not seem to have had a coercive effect, because the jury did not return its verdict until the following morning. Third, according to Johnson's testimony, although the jurors had discussed at some point what would happen if they could not reach a decision, they never did in fact reach a point where they were deadlocked. Finally, we have no doubt that had the jury in this case sent a message to the judge midway through the first full day of deliberation telling the judge that the jurors were unable to reach a decision, and had the judge replied, without having consulted with counsel, "Go back and deliberate more," there would have been no fundamental defect or miscarriage of justice. *Berrisford v. Wood,* 826 F.2d 747, 752 (8th Cir.1987), *cert. denied,* 484 U.S. 1016, 108 S.Ct. 722, 98 L.Ed.2d 671 (1988). We cannot say that a different result is required in this case because one juror overheard the bailiff say to another juror that she thought the judge would give such an instruction. We conclude, therefore, that the improper communications do not entitle Boykin to the writ.

### III.

■ Boykin claims that his constitutional rights were violated when the state introduced as evidence an incriminating statement that he made to a deputy when he was strip-searched. Boykin complained to the deputy that the police had taken his shoes. The deputy told Boykin that the police had probably taken the shoes "in order to make casts or to take pictures of the shoes in case they had a print at the crime scene matching his tennis shoes." In response to that explanation, according to the deputy's testimony at trial, Boykin "bowed his head a little bit and he said, 'Yeah, maybe they do.'" Boykin argues that this statement should have been suppressed.

■ In order for the statement to violate Boykin's rights under the Fifth Amendment, the statement must have been the result of an interrogation made while Boykin was in custody. There is no doubt that

Boykin was in custody. Boykin argues that the deputy's behavior amounted to a subtle form of police coercion that must be considered an interrogation. In determining whether the statement was the result of an interrogation the focus is on Boykin's own perceptions of the deputy's behavior at the time the conversation took place. *United States v. Henderson,* 770 F.2d 724, 728 (8th Cir.1985). "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). The circumstances of Boykin's conversation with the deputy do not support the conclusion that Boykin considered himself under interrogation when the conversation took place. He was not "subjected to compelling influences, psychological ploys, or direct questioning." *Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 1937, 95 L.Ed.2d 458 (1987). We find no violation of Boykin's rights under the Fifth Amendment.

### IV.

■ In response to Boykin's motion in limine to exclude from trial out-of-court statements made by Adams to Paul Pingeon, a fellow inmate, the trial court ordered the state to instruct Pingeon to redact Adams's statements so that those statements that Adams had made in the active voice (we did it) would come into evidence in the passive voice (it was done). The court's purpose was to make the statements ambiguous as to number so that Adams's statements did not inculpate Boykin. At trial, however, Pingeon failed to redact one of the statements properly: he testified that Adams had said that "the money wasn't what they were after, but the keys is what was worth the real money." Pingeon did not, however, mention Boykin in this context, or, indeed, in any other incriminating context. Following the conclusion of Pingeon's direct examination the court instructed the jury that Pingeon's testimony could only be used to prove Adams's guilt which was relevant in Boykin's trial because of the state's theory that he had aided and abetted Adams.

Boykin argues that he is entitled to a new trial because the unredacted out-of-court statement was unfairly prejudicial and denied Boykin the opportunity to confront the declarant. Boykin relies on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which reversed the petitioner's conviction where the prosecution had introduced evidence of his co-defendant's out-of-court statement that unambiguously inculpated both the co-defendant and the petitioner. The Court held that "admission of [the co-defendant's] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." 391 U.S. at 126, 88 S.Ct. at 1622.

We do not find Pingeon's recounting of Adams's statement to be prejudicial to Boykin. Because Pingeon did not mention Boykin in any context linked to Adams's incriminating statements, the use of the third person plural instead of the more ambiguous passive voice cannot be said to be evidence of anything other than the fact that Adams did not act alone. We are skeptical that the statement can be said to be evidence of even that: we note that in contemporary American colloquial usage the third person plural is often used when the speaker wishes to be ambiguous as to number or gender. Earlier in its examination of Pingeon, for example, the prosecution sought a description of the jail in which he and Adams were held, asking "Does each inmate have their own cell?" The prevalence of this and similar constructions in spoken and written English, *see, e.g., Webster's Third New International Dictionary* 2374 (1986); *Oxford American Dictionary* 956 (1986), leads us to conclude that Adams's statement as recounted by Pingeon was not unfairly prejudicial to Boykin.

### V.

■ A small amount of blood was discovered on one of the tennis shoes that Boykin was wearing when he was arrested. The police stored the shoe in a plastic bag and failed, initially, to freeze it. The state's own expert has criticized both of these practices: blood samples should be stored in paper, not plastic, because plastic retains moisture

which contributes to the deterioration of the blood, and should be frozen immediately. When the state tested the blood stain, it found that the blood was type A. It was unable to test for other blood characteristics either because the sample was too small or because it had degraded because it had not been properly stored. Jensen had type O blood. Both Adams and Boykin have type A blood; a test for other characteristics, therefore, would be necessary to distinguish the source of the blood. Boykin argues that the state's failure to store the sample properly deprived him of possibly exculpatory evidence because if the blood were proven to be that of someone other than Adams, the stain would not be evidence that Boykin was present at the scene of the crime where other samples of Adams's blood had been found.

A "state's failure to preserve evidence does not constitute a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory value and comparable exculpatory evidence was not reasonably available to the defendant." *United States v. Marlbrough*, 922 F.2d 458, 463 (8th Cir.1990) (citing *California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984)), *cert. denied*, 501 U.S. 1258, 111 S.Ct. 2907, 115 L.Ed.2d 1071 (1991). It is clear that although the state did act negligently, it did not act in bad faith. It is not clear, moreover, that the evidence had apparent, or, indeed, any, exculpatory value. If the blood were shown to be Adams's, it does not show that Boykin was at the scene of the crime because witnesses placed Boykin and Adams together before and after the crime and Adams was shown to have a cut on his hand. If the blood were shown to be Boykin's, that would not preclude the possibility that Boykin was at the scene of the crime. We cannot say, therefore, that the blood stain was apparently exculpatory. It is possible, furthermore, that even if the shoe had been properly stored, the small size of the sample would still have prevented the testing of blood characteristics other than ABO type. Since Boykin cannot show any prejudice to him from the state's failure to preserve evidence, we find no deprivation of his constitutional right to due process.

## VI.

Two of the witnesses who testified at Boykin's trial had been hypnotized as part of the investigation into Jensen's murder in the hope of obtaining an identification of the perpetrators. Hypnosis did not reveal much new information. The trial court limited the testimony of those witnesses to the contents of pre-hypnotic statements made to the police and the hypnotist. Boykin claims that admitting the testimony of witnesses who had been hypnotized violated his right to confront those witnesses.

Both the state and Boykin rely on *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112 (8th Cir.1985), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986), and *Little v. Armontrout*, 819 F.2d 1425 (8th Cir.1987). *Sprynczynatyk* was a civil case in which the post-hypnotic recollection of one of the plaintiffs' witnesses contradicted his pre-hypnotic statements regarding facts material to the plaintiffs' case. We held that in considering whether hypnotically enhanced testimony is sufficiently reliable to be admissible at trial a court should consider whether and to what degree certain safeguards had been followed before and during hypnosis. 771 F.2d at 1122–23. These include ensuring that the hypnotist is an impartial licensed psychiatrist or psychologist trained in hypnosis, recording any information given to the hypnotist by a party other than the witness, recording the witness's pre-hypnotic recollection of the relevant events, recording the hypnosis session, preferably on videotape, and limiting attendance at the session to the witness and the hypnotist unless the presence of others can be shown to be essential. 771 F.2d at 1123 n. 14. We noted, however, that even if all of the safeguards are followed the testimony is not automatically admissible, and that even if none is followed the testimony is not automatically inadmissible. 771 F.2d at 1123 n. 15.

In *Little,* a petition for writ of habeas corpus following a state conviction, we considered the admissibility of a victim's post-hypnotic identification of a criminal defendant as her assailant. We granted the petitioner's writ in that case, reversing the Dis-

trict Court, because none of the procedural safeguards recommended in *Sprynczynatyk* had been followed. Thereafter we granted the appellee's petition for rehearing en banc, 825 F.2d 184 (8th Cir.1987). On rehearing en banc, we granted the writ, but, as neither party points out in this appeal, we found it unnecessary to decide whether the safeguards adopted for the civil context in *Sprynczynatyk* applied in criminal cases. *Little v. Armontrout*, 835 F.2d 1240 (8th Cir.1987) (en banc), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). We granted the writ because the state's failure to provide the petitioner, an indigent defendant, with an expert in hypnosis deprived the petitioner of a meaningful chance to present his defense that the hypnosis influenced or enhanced the testimony. 835 F.2d at 1243–45.

Once again we need not decide whether *Sprynczynatyk* applies in criminal cases. Because the post-hypnotic recollections and the trial testimony were consistent with pre-hypnotic statements, this is not a case in which a party argues that hypnotic suggestion led to confabulation or recall of lost or repressed memories; rather, at issue here is whether hypnotic suggestion hardened the witnesses' memories or otherwise impaired Boykin's ability to cross-examine the witnesses effectively. For detailed discussions of the problems with post-hypnotic testimony see *Sprynczynatyk*, 771 F.2d at 1118–21, and the vacated opinion of the panel in *Little*, 819 F.2d at 1429–32.

If Boykin's cross-examination of the witnesses had been met with unshakable assertions of the veracity, accuracy, and certainty of statements that were, prior to hypnosis and according to the witnesses' own prior statements, doubtful, tentative and, uncertain, Boykin could argue that hypnotizing the witnesses deprived him of the opportunity to cross-examine the witnesses effectively. In fact, however, on both Boykin's cross-examination and on the state's direct examination, these witnesses remained doubtful, tentative, and uncertain where they were so prior to hypnosis. Boykin's cross-examination was, moreover, quite brief. On this record, we cannot see how Boykin's cross-examination of the previously hypnotized witnesses was impaired, and, therefore, can find no constitutional error.

## VII.

Boykin's final argument is that he was denied a fair trial because the trial court refused to grant his motions for a change of venue. Because of the extensive publicity Jensen's murder and Adams's trial received, most of the venire were familiar with the case. Boykin argues that the chosen jury had, therefore, prejudged him. The South Dakota Supreme Court found that pretrial publicity did not deprive Boykin of a fair trial. We will overturn such a finding only if it is manifestly erroneous. *Swindler v. Lockhart*, 885 F.2d 1342, 1347 (8th Cir.1989), *cert. denied*, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). That finding is well supported by the record. We have made clear that a defendant is entitled to an impartial jury, but not an ignorant one. *Swindler*, 885 F.2d at 1348. Indeed,

> [i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.... To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961).

## VIII.

For the reasons given, we affirm the judgment of the district court denying Boykin a writ of habeas corpus.