THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MONROE LAMPKIN, Defendant-Appellant.

Third District   No. 3—91—0157

Opinion filed October 4, 1993.

Frank W. Ralph, of State Appellate Defender's Office, of Ottawa, for appellant.

William Herzog, State's Attorney, of Kankakee (Roland W. Burris, Attorney General, and Marcia L. Friedl, Assistant Attorney General, of counsel), for the People.

JUSTICE BRESLIN delivered the opinion of the court:

The defendant was charged with the April 7, 1979, murders of two police officers and a civilian. Following a jury trial, he was convicted of all three counts and was sentenced to death. On direct appeal to the Illinois Supreme Court, his convictions were reversed and the cause was remanded for a new trial. (*People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 50.) On remand, the defendant was again convicted by a jury. On appeal to this court, the defendant's convictions were reversed and the cause remanded for a third trial. In so doing, this court found that one witness improperly testified to certain facts which were the product of post-hypnotic recall. (*People v. Lampkin* (1990), 193 Ill. App. 3d 570, 550 N.E.2d 278.) On remand, the defendant was again convicted. The defendant appeals, contending that the same occurrence witness again testified based on improper post-hypnotic recall. The defendant also argues that the State improperly elicited testimony relating to his post-arrest silence. We find that the defendant received a fair trial and we affirm.

The defendant's cause proceeded to trial by jury a third time on January 24, 1991. The evidence adduced at that trial revealed that the defendant was a passenger in a Thunderbird driven by his brother, Cleveland Lampkin. The two men travelled southbound on Interstate 57, near Paxton, Illinois, shortly before 9 p.m., on April 7, 1979.

Melvin Lynch testified that on the evening of April 7, 1979, he and his wife were driving south on I-57 in a white van. As they did so, they paced themselves with three other southbound vehicles: a

red pickup truck driven by David and Clyde Lampkin, who were the defendant's brothers; a silver Thunderbird driven by the defendant's brother Cleveland Lampkin and in which the defendant was a passenger; and an old dark-colored Buick. As the four vehicles approached the ramp for Paxton, a blue unmarked State police car, driven by Illinois State Trooper Michael McCarter, apparently attempted to stop the other above-mentioned vehicles. McCarter's brother-in-law, Donald Vice, was a passenger in McCarter's unmarked police car. The Lynches pulled off on the shoulder of the highway and stopped, as did the other vehicles, except for the Thunderbird. It sped off in the passing lane at high speed.

At that point, a white Paxton police car, driven by Paxton police officer William Caisse, came down the southbound ramp and pulled off onto the shoulder of the highway.

Lynch testified that Trooper McCarter exited his unmarked squad car, in uniform, walked to the old, dark-colored Buick, and said something to the driver. McCarter then came to the van and asked Mrs. Lynch for her driver's license, and she handed it to him. McCarter told Mrs. Lynch that she would have to pull up the road to where Officer Caisse had stopped since he was going to have to run down the car that did not stop. As the van and the Buick pulled to the rear of Officer Caisse's Paxton police car, McCarter passed the other vehicles and stopped in front of the red pickup. After talking with and exchanging papers with Caisse, McCarter got back in his car and drove south at high speed. Caisse, who was in uniform, then came back to the Lynch van and explained that he would get behind the three stopped vehicles with his lights on for safety.

Mr. Lynch testified that eventually Officer Caisse got out of his squad car and told them that they would have to pull up to where Trooper McCarter had the other vehicle stopped. Caisse and the other three vehicles that had stopped then drove for about a mile until they came to a viaduct where the Thunderbird and McCarter's car were stopped. The Thunderbird was just south of the viaduct, half on the shoulder of the highway and half on the grass. McCarter's car was also south of the viaduct, but was behind the Thunderbird. The red pickup truck stopped behind McCarter, followed by the Lynch van, the old Buick, and Caisse's squad car.

After hearing two or three gunshots to the south on the western side of the viaduct, Mr. Lynch saw Trooper McCarter, who was standing by the driver's side rear tire, fire one round in an elevated, southwesterly direction. He then walked at a fast pace north

past the driver's side of the van with his service revolver in his right hand. After a conversation with Officer Caisse, McCarter walked back to the viaduct on the left side of the line of vehicles. At that time, Caisse pulled his car into the right lane of the highway and drove toward the viaduct, where he stopped with his car behind McCarter's and directly under the viaduct, half on the shoulder and half on the highway. As McCarter passed by the van, Mr. Lynch noticed a blood stain on the lower left side of the trooper's back. After his car was parked, Caisse got out and assisted McCarter to Caisse's squad car. Caisse placed McCarter in the passenger seat with his feet hanging out on the ground. Lynch never saw McCarter move again.

Sometime after Officer Caisse assisted Trooper McCarter, Paxton police Sergeant Larry Hale drove up behind the line of vehicles. Sergeant Hale, who was in uniform, got out of his squad car and ran under the viaduct to the left front fender of Caisse's car. Hale drew his service revolver and fired two rounds in an elevated, southwesterly or westerly direction. Thereafter, Hale and Caisse removed a shotgun from the trunk of Caisse's car. Caisse kept the shotgun.

While the officers were getting the shotgun out, David Lampkin exited the red pick-up truck and retrieved a shotgun from the back. David Lampkin then shot Officer Caisse. Caisse had been standing with his weapon diagonally in front of him while he looked in a southwesterly direction toward the viaduct. As Caisse fell to the ground, David Lampkin ran to Caisse's squad car, put the barrel of his weapon against Trooper McCarter's chest, and fired again. At that point, the Lynches drove away. As they drove off, Lynch saw David Lampkin looking toward the top of the south end of the viaduct.

The testimony of Hobert Litteral, from the second trial, was read at the third trial. Hobert Litteral testified that he was driving north on I-57 on the evening in question. He saw a State trooper who appeared to be wounded pursuing a man in a bright colored "reddish" or brown jacket, which was made of vinyl or leather. The man in the jacket was running north and jumped over a guardrail and appeared to be going over the embankment. Litteral identified the jacket the defendant had been wearing as similar to the jacket he saw on the fleeing man.

Another passerby who testified as to what he saw on I-57 on the night of April 7, 1979, was William Brinegar, who stopped his car on Route 17 and looked down and saw two cars below. Prior to

trial, the defendant filed a motion *in limine* to exclude Brinegar's testimony, which the trial court denied, finding that Brinegar could testify as to his prehypnotic recall. Brinegar described seeing two men in the area of McCarter's car, one lying on the ground next to the rear of the car and the other sitting on the ground at a 90-degree angle to the car with his shoulder against the door post and his head on the front passenger's seat. Hearing a "pop" and then a series of pops or shots as he went back to his car, Brinegar drove off.

Paxton city police Sergeant Larry Hale testified about what happened after he arrived at the scene. Seeing two muzzle flashes near the upper part of the Route 17 overpass, he fired twice in that direction with his handgun. Hale then got a shotgun out, handed it to Caisse, and warned him to put on a bulletproof vest. Going back to his own car, Hale radioed for help and then got a shotgun and bulletproof vest out of his trunk. While at his car, Hale heard a car door slam on the overpass and also heard gunshots. After walking back to the area of Caisse's car, David Lampkin shot Hale in the leg. David Lampkin fired again, but Sergeant Hale fired back four times with his shotgun, spinning David Lampkin around and killing him.

When other officers and emergency personnel arrived at the scene they found Trooper McCarter dead, sitting in the front seat of Officer Caisse's car. Vice was found dead on the ground next to McCarter's car, while Cleveland Lampkin lay facedown on the passenger's side front seat of that car with his legs hanging out on the ground. Caisse and David Lampkin were found on the ground near Caisse's car.

Captain William Willis, an Illinois Department of Law Enforcement investigator, testified that he arrested the defendant just before midnight on April 8, 1979, in a ditch near the intersections of Routes 9 and 45 near Paxton. The defendant had been shot in the wrist and was wearing a reddish-brown leather jacket. No weapon was found on or near the defendant. After the defendant was given his *Miranda* warnings, the defendant told the investigator that a State trooper shot him.

At this point in Investigator Willis' testimony, the prosecutor asked the investigator the following question: "After this conversation what, if anything did you do with the defendant ***[?]" Willis responded that "[the defendant] said 'I don't have to say anything' after he said, 'I—you know, I didn't have a gun.' " At that point, defense counsel objected and moved for a mistrial. Outside the pres-

ence of the jury, the respective counsel argued their positions on whether a mistrial should be granted. Twenty-eight minutes after defense counsel made his initial objection, the trial court sustained the objection and instructed the jury to disregard the last question and response, but denied the mistrial.

Ballistics expert Krail Lattig testified that the projectile recovered from the body of Cleveland Lampkin was consistent with having been fired by Trooper McCarter's handgun. The projectiles recovered from the body of Officer Caisse and the chest of McCarter were consistent with the rifle found next to David Lampkin. The projectile recovered beneath the body of David Lampkin was consistent with Sergeant Hale's handgun. The projectiles recovered from the shirt of McCarter and from the body of Vice were apparently fired by the same weapon, but that weapon was not found at the scene. The cartridge cases recovered from the fence area and bridge area of the Route 17 overpass did not match any of the weapons found at the scene.

Deborah Verges, a former forensic scientist for the Illinois Department of Law Enforcement, testified that tests revealed that the defendant had type O blood and that Cleveland Lampkin had type B blood. Verges further determined that blood scrapings from the concrete abutment at the Route 17 overpass on I-57, as well as the blood on casings discovered in that area, were type O and thus were consistent with the blood of the defendant and inconsistent with that of Cleveland Lampkin.

On appeal, the defendant argues that Brinegar was erroneously allowed to give hypnotically enhanced testimony that went beyond his prehypnotic recall. The defendant claims that Brinegar's testimony at the third trial went beyond a statement he gave to police before he was hypnotized in several key respects. The defendant contends that he was prejudiced by the discrepancies between the two versions because the trial testimony tended to show that it had to be the defendant who fired the gun from near the top of the viaduct because it indicated that Cleveland Lampkin, the only other possible suspect, had been mortally wounded earlier on in the gun battle.

■ In *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571, the Illinois Supreme Court addressed the question of whether a previously hypnotized witness may testify regarding his prehypnotic recollection. There, a witness testified that he observed the shooting of two police officers from inside his home. The witness underwent hypnosis to recall the license plate number of the vehicle the

officers had stopped. Four days later, the witness identified the defendant as one of two men who had shot the officers. In *Wilson*, the supreme court noted that the main danger to prehypnotic testimony lies in the bolstered confidence that hypnosis may impart even to testimony based on prehypnotic recollection. Nonetheless, the court noted that a total bar on testimony derived from prehypnotic recollection would exact an unnecessary toll. The court stated that the proponent of such testimony should establish the nature and extent of the witness' prehypnotic recall. The parties should also be permitted to present expert testimony to explain to the trier of fact the potential effects of hypnosis. Finally, the court held that the State must demonstrate to the court that the post-hypnotic identification of the defendant was anchored in the witness' prehypnotic recollection.

Brinegar's prehypnotic statement to the police stated in relevant part:

"While approaching the overpass, Brinegar observed one set of red lights flashing to the north side of the overpass on Interstate 57 southbound *** [Brinegar] then exited his vehicle, leaving the left front door open and went to the southwest corner of the bridge and looked down onto the southbound lanes. [He], at that time observed a gray 2-door unit sitting south of the overpass on the shoulder of southbound land. The gray unit's left door was open and he noticed the glass was missing. [He] then observed a dark colored unit sitting directly below him or just south of the bridge, on the southbound shoulder. Both right doors on this dark colored unit were opened. At this time, he observed a person lying partially in the right front seat of the dark colored unit.

The shoulder and head of this individual were on the right front seat of the dark colored unit. [He] then noticed a man lying to the right rear of the dark colored unit, with his feet toward the west. Neither individual that he observed made any movements. William then heard a shot, turned and returned to his vehicle during which he heard five or six more shots. All shots that [he] heard sounded the same. [He] then drove his vehicle to the service road ***."

The defendant points to six different discrepancies between Brinegar's trial testimony and the above-quoted statement to police. First, Brinegar told police in his statement that he saw a person on the passenger's side "lying partially in the right front seat of the dark colored unit" and that "the shoulder and head of this individ-

ual were on the right front seat" and that he did not make any movements. The defendant claims that this portion of his statement to police is somehow consistent with the possibility that the individual described lying in the right front seat was McCarter crouching down to avoid bullets. The defendant argues that the trial testimony precludes this possibility because Brinegar testified that the person he observed was "sitting on the ground" with his shoulder up against the door post and "lying at probably a ninety degree angle to the car."

■ After carefully comparing the police report with the trial testimony, we fail to see how the trial testimony was any more inculpatory than the statement in the police report. If anything, the trial testimony gave more support to the defendant's theory that the individual near the front seat was McCarter and not an incapacitated Cleveland Lampkin. As the State points out, a literal reading of Brinegar's police statement would have more clearly than his trial testimony placed Cleveland Lampkin's body in the position that Dan Grady testified that it was in when found at the scene. Grady testified that Cleveland's body was half in and half out of the car and facedown. His upper torso was on the right seat as were both of his hands.

Second, the defendant complains that Brinegar noted in his police statement that he heard one shot followed by five or six more but that he testified at trial that the first shot was followed by a series of shots. The defendant argues that this "new detail" allowed the prosecutor to argue before the jury that the shots were fired in succession. We find the defendant's argument unpersuasive. The prosecutor could have made the same argument using either the statement or the testimony. The police report distinguished the one shot from the five or six more which all occurred from the time Brinegar turned to his car and the time he reached his car. Further, all the shots sounded alike.

Third, the defendant argues that Brinegar should not have been allowed to identify the photograph of the scene which was taken of the two vehicles mentioned in the statement sometime after Cleveland's body was removed from the vehicle but before Vice's body was removed. We disagree. In view of the detail in Brinegar's prehypnotic statement to police, we find that there was sufficient evidence to indicate that the witness' post-hypnotic identification of the photo was anchored in the witness' prehypnotic recollection. See *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571.

Finally, the defendant points to three other discrepancies between Brinegar's statement and his trial testimony. Specifically, the color of the car (dark v. blue), the position of the person's feet Brinegar saw lying in the rear passenger side door, and the use of the term "bodies" rather than terms such as "individuals" or "persons" to describe the people he saw lying in the vehicle. We find that the complained-of discrepancies were so insignificant that they were harmless. Moreover, we note that they were irrelevant to any theory of innocence suggested by the defendant.

After the second trial of this case, this court noted on appeal that it was concerned with the following discrepancies between the police report and trial testimony: (1) the police report did not mention the race of the individual Brinegar saw in the front doorway of McCarter's car; (2) the police report stated that the individual did not move; and (3) there was no indication in the police report that Brinegar knew the direction from which the shots he heard were fired. In the third trial, Brinegar did not testify in contradiction to the police report on any of the points that were of concern to the appellate court after the second trial. Moreover, the claimed discrepancies in the third trial, unlike the discrepancies pointed out by this court after the second trial, were minor and insignificant. Further, they were not relevant in that the trial testimony was not in any way more inculpatory to the defendant than was the police statement. In sum, the trial testimony as a whole was consistent with the police report and only differed in very minor and insignificant detail, which was peripheral to the defense and which would only be natural given that the trial testimony was introduced some 12 years after the statement to the police. Thus, we conclude that the State met its burden of establishing that Brinegar's testimony was based solely upon his independent, prehypnotic recall. See *People v. Zayas* (1989), 131 Ill. 2d 284, 546 N.E.2d 513.

The defendant next argues that the trial court erred when it failed to grant a mistrial but instead admonished the jury to disregard the arresting investigator's unsolicited reference to the defendant's post-arrest silence. The defendant relies on *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, in support of his assertion.

The actual holding of *Doyle* is that the due process clause bars the use of a defendant's post-arrest silence for impeachment purposes. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *Greer v. Miller* (1987), 483 U.S. 756, 97 L. Ed. 2d 618, 107 S. Ct. 3102.) The *Doyle* court noted that " 'it does not comport

with due process *to permit* the prosecution during trial to call attention to [the defendant's] silence.' " (Emphasis in original.) (*Greer v. Miller* (1987), 483 U.S. 756, 763, 97 L. Ed. 2d 618, 629, 107 S. Ct. 3102, 3108, quoting *Doyle v. Ohio* (1976), 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245.) The fact that the prosecution did not elicit the response, but instead the remark was a spontaneous comment by the witness, mitigates in favor of a finding that the error was harmless. (*United States v. Smith* (5th Cir. 1981), 635 F.2d 411.) It has been found significant that in each of the cases in which the Supreme Court has applied *Doyle,* the trial court permitted specific inquiry or argument regarding the defendant's post-arrest silence. *Greer v. Miller* (1987), 483 U.S. 756, 97 L. Ed. 2d 618, 107 S. Ct. 3102.

In *Greer,* the Supreme Court held that an objection which was interposed before an improper question about post-arrest silence could be answered, and which was followed by an instruction to the jury to ignore the question, sufficed to prevent a *Doyle* violation from even occurring. The Court also considered that curative instructions were at least effective to prevent the prosecutorial misconduct of putting defendant's post-arrest silence before the jury from rendering the trial fundamentally unfair. See *United States v. Carter* (5th Cir. 1992), 953 F.2d 1449.

■ In the instant case, the prosecutor did not elicit the complained-of remark of Investigator Willis. The remark was not responsive to the prosecutor's question and was the only comment on the defendant's silence at trial. The prosecutor did not focus on or highlight the defendant's silence in his examination of the witnesses or in his closing argument. Moreover, the trial judge sustained the defendant's objection and admonished the jury without repeating the question (thus not highlighting it) to disregard the comment some 28 minutes after it was made. Furthermore, the comment was not used for impeachment purposes, nor did it undermine any exculpatory defense offered by the defendant. Under the circumstances, we find that any error with respect to the remark was harmless.

For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

Affirmed.

McCUSKEY, P.J., and BARRY, J., concur.